*Lawrence Ervin Montague v. State of Maryland*
No. 75, September Term 2019

**EVIDENCE – FACTORS AFFECTING ADMISSIBILITY – RELEVANCE OF RAP LYRIC EVIDENCE**

The Court of Appeals held that rap lyric evidence has heightened probative value, and is admissible as substantive evidence of a defendant's guilt, when the lyrics bear a close nexus to the details of an alleged crime. When a defendant's rap lyrics bear a close nexus to the details of an alleged crime, those lyrics exceed the low relevance threshold of Maryland Rule 5-401, and are therefore admissible under Maryland Rule 5-402, because they make it more probable that the defendant committed the alleged crime. Petitioner's rap lyrics had a close nexus to details of an alleged murder because the lyrics had a close factual nexus to the details of the murder, had a close temporal nexus to the murder, and recited "stop snitching" references that were published on social media to potentially intimidate witnesses to the murder. As a result of this close nexus, Petitioner's rap lyrics tended to prove his involvement in the murder and served as substantive evidence of his guilt.

**EVIDENCE – FACTORS AFFECTING ADMISSIBILITY – PREJUDICIAL EFFECT AND PROBATIVE VALUE OF RAP LYRIC EVIDENCE**

The Court of Appeals held that the Circuit Court for Anne Arundel County did not abuse its discretion in admitting Petitioner's rap lyrics under Maryland Rule 5-403 because the probative value of the lyrics was not substantially outweighed by the danger of unfair prejudice. Even when relevant, defendant-authored rap lyrics carry inherent prejudicial effect as propensity evidence of the defendant's bad character. For rap lyric evidence to be admitted as substantive evidence of the defendant's involvement in a crime, the evidence must survive a balancing of probative value and unfair prejudice under Rule 5-403. When a close nexus exists between a defendant's rap lyrics and the details of an alleged crime, the heightened probative value of the lyrics is not substantially outweighed by the reduced danger of admitting the lyrics as unfairly prejudicial propensity evidence. When a defendant's rap lyrics are "insufficiently tethered" to the details of an alleged crime, the lyrics should be excluded as unfairly prejudicial propensity evidence. The probative value of Petitioner's rap lyrics was not substantially outweighed by the danger of unfair prejudice because a close nexus existed between Petitioner's lyrics and the details of an alleged murder.

Circuit Court for Anne Arundel County
Case No. 02-CR-17-000378
Argued: September 14, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 75

September Term, 2019

_____

LAWRENCE ERVIN MONTAGUE

V.

STATE OF MARYLAND

_____

Barbera, C.J.,
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Opinion by Getty, J.
Watts, J., dissents.

_____

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

Filed: December 23, 2020

In the early 1970s, a multicultural clash of musical influences in the Bronx, New York, spawned a revolutionary genre of music. What began as disc jockeys, like DJ Kool Herc, incorporating spoken verses into elements of Jamaican dance hall, funk, soul, and disco at local parties, initially evolved into "hip-hop" and then became the ubiquitous beat of rap music that is widely disseminated in the United States and world-wide. Over the past five decades, featuring artists such as Run-D.M.C., 2Pac, and Drake, rap music has been closely interwoven with all aspects of American culture. "More than simply entertainment," rap music "is a major part of contemporary identity circuits" and reflects "trends, ideals, [and] conditions in society."[1]

Accordingly, rap music often influences the behavior of a large segment of society. Relevant to this case, the interconnected relationship between contemporary culture and rap music is illustrated by rap's reinforcement of a "street code." A prevalent feature of this "street code" is that the use of violence is central to retaining respect and enforcing social norms.[2] As a result of this interconnected relationship, understanding the "street code" contained in rap music is often essential to understanding "the principles governing . . . interpersonal public behavior."[3]

---

[1] Kathleen Odenthal, *How Hip-Hop Music Has Influenced American Culture and Society*, Spinditty (June 26, 2019), https://spinditty.com/genres/Hip-Hops-Influence-on-America [https://perma.cc/4VQS-BQT7] (quoting Derek Pardue, *Hip Hop as Pedagogy: A Look into "Heaven" and "Soul" in Sao Paulo, Brazil*, 80 Anthropological Q. 673, 674 (2007)).

[2] Charis E. Kubrin, *Gangstas, Thugs, and Hustlas: Identity and the Code of the Street in Rap Music*, 52 Soc. Probs. 360, 375 (2005).

[3] *Id.* at 363.

This case is about the admissibility of jailhouse rap lyrics composed by Lawrence Montague as substantive evidence that he shot and killed George Forrester. In the early morning hours of January 16, 2017, Mr. Forrester was shot and killed by a drug dealer after he attempted to purchase cocaine using a counterfeit $100 bill. Mr. Forrester's cousin, Tracy Tasker, accompanied him to purchase the drugs and, after witnessing the shooting, fled in Mr. Forrester's vehicle. Ms. Tasker was later arrested for unrelated warrants and identified Mr. Montague as the shooter. Mr. Montague was later indicted for Mr. Forrester's murder.

Three weeks before trial, while incarcerated in the Anne Arundel County Detention Center, Mr. Montague made a telephone call to an unidentified male using another inmate's personal identification number passcode. Mr. Montague requested that the unidentified male record his rap, which included lyrics that matched the details of Mr. Forrester's murder. The rap lyrics also made references to shooting "snitches" and the recording was subsequently uploaded on Instagram. The State sought to introduce the recorded telephone call containing the rap lyrics as substantive evidence of Mr. Montague's guilt, and Mr. Montague moved *in limine* to exclude the recording. The circuit court admitted the rap lyrics and, on appeal, the Court of Special Appeals agreed that the lyrics are admissible under Maryland Rules 5-401, 5-402, and 5-403.

We also agree. We hold that Mr. Montague's rap lyrics are relevant under Rule 5-401, and therefore admissible under Rule 5-402, because they make it more probable that Mr. Montague shot and killed Mr. Forrester. The rap lyrics bear a close factual and temporal nexus to the details of Mr. Forrester's murder, and that nexus is strengthened by

2

Mr. Montague's use of "snitch" references to potentially intimidate witnesses. As a result of this close nexus, we also hold that the trial judge did not abuse his discretion in admitting the rap lyrics under Rule 5-403. We therefore affirm the judgment of the Court of Special Appeals.

## BACKGROUND

### A.  *The Shooting.*

In the early morning hours of January 16, 2017, George Forrester and his cousin, Tracy Tasker, drove to the Woodside Gardens apartment complex in Annapolis to find a drug dealer. Upon arrival, Mr. Forrester pulled his Ford Explorer sport utility vehicle ("SUV") into a parking spot facing 708 Newtowne Drive ("708 Newtowne"). While Ms. Tasker remained in the SUV, Mr. Forrester exited the vehicle to look for a drug dealer. When he saw someone at the back of the parking lot, he walked that way and attempted to purchase cocaine. That attempted drug transaction was unsuccessful.

Mr. Forrester then walked from the back of the parking lot towards a second individual who was standing on the sidewalk between the SUV and 708 Newtowne. After a short verbal exchange with Mr. Forrester, that individual ascended the stairs to an apartment on the second floor of 708 Newtowne. He returned about two minutes later and gave a quantity of drugs to Mr. Forrester. However, according to Ms. Tasker, the $100 bill that Mr. Forrester used to pay for the cocaine was counterfeit.

The drug dealer quickly realized that the bill was counterfeit and pursued Mr. Forrester from 708 Newtowne to the SUV. Sensing his approach, Mr. Forrester moved towards the SUV's driver-side door but did not open it or enter the SUV. Instead, he

3

walked past the SUV further into the parking lot where the drug dealer, standing on the sidewalk in front of the SUV, confronted him and exclaimed: "[G]oddamn, give me my shit, man."

The drug dealer then raised a firearm and shot Mr. Forrester in the back. Ms. Tasker was attempting to exit the vehicle as this situation unfolded and watched the drug dealer as he fired his weapon. When the drug dealer noticed that Ms. Tasker was in the passenger seat of the SUV, he turned and fled in the direction behind 708 Newtowne. Ms. Tasker exited the SUV, attempted to render aid to Mr. Forrester, and took his pulse. When the security employees of the apartment complex arrived, Ms. Tasker also fled the scene by driving away in Mr. Forrester's vehicle because she had open warrants for her arrest and did not want to be there when law enforcement officers arrived.

Officer Brittany Artigues was the first officer of the Annapolis Police Department to arrive at the crime scene. She began performing lifesaving procedures on Mr. Forrester until paramedics arrived. At trial, Officer Artigues testified that paramedics from the Annapolis Fire Department arrived and, shortly thereafter, she "saw that [Mr. Forrester] left in the ambulance." She then canvassed the scene and located two .40-caliber shell casings and one spent bullet.

Officer Thomas arrived on scene at about 5:00 a.m. to assist with the crime scene investigation.[4] Officer Thomas marked and photographed one .40-caliber shell casing on the sidewalk in front of 708 Newtowne, another on the parking lot next to the curb, and a

---

[4] The record does not include Officer Thomas' first name.

spent bullet nearby. Officer Joseph Mann and Sergeant Jessica Kirschner, among other officers, canvassed the apartment complex for witnesses but had a difficult time gathering information because residents were generally uncooperative.

Shortly after arriving at the Anne Arundel Medical Center, Mr. Forrester was pronounced deceased from the injuries caused by the gunshot.

**B.      *The Investigation and Arrest of Mr. Montague.***

Two days after the shooting, on January 18, 2017, Annapolis police officers arrested Ms. Tasker for her outstanding warrants, and she was interviewed by Detective Charles Bealefeld. Ms. Tasker admitted that she was the person sitting in the passenger seat of Mr. Forrester's SUV when the drug exchange occurred. She added that she turned and "saw the guy" who raised his firearm and shot Mr. Forrester. Detective Bealefeld displayed photographs from several individual manila folders of potential suspects. Ms. Tasker quickly identified Lawrence Montague's photograph as that of the drug dealer who shot Mr. Forrester. She affirmed that she was "[a]bsolutely positive" that Mr. Montague was the shooter because she knew him from two previous encounters where she had bought drugs from him.

About two weeks after the interview of Ms. Tasker, officers arrested Mr. Montague at a motel near Annapolis and, on February 24, 2017, he was indicted for the murder of Mr. Forrester.

At trial, Ms. Tasker testified that she encountered Mr. Montague while they were both incarcerated at the Jennifer Road Detention Center ("Jennifer Road"). Ms. Tasker was housed in the Jennifer Road medical unit for a short period of time and, while waiting

5

for her medicine in the hallway of the unit, Mr. Montague came through the hallway in a wheelchair. When Mr. Montague recognized Ms. Tasker, he looked directly at her and called her a "f----n' rat." Ms. Tasker did not notify anyone at the detention center of this encounter, and Mr. Montague was subsequently transferred to the Anne Arundel County Detention Center.

## C.    *The Rap Lyrics.*

Three weeks before trial, on October 7, 2017, Mr. Montague made a telephone call from the Anne Arundel County Detention Center using another inmate's personal identification number ("PIN") passcode for telephone calls.[5] During this telephone call, Mr. Montague spoke with an unidentified male and made several statements in the form of an amateur rap that he composed while incarcerated and awaiting trial.

Mr. Montague requested that the unidentified male record his rap lyrics. The unidentified male responded: "I'm ready to record you . . . it's going on my Instagram so you're on live with me right now."

After the unidentified male stated that he was ready to record, Mr. Montague rapped:

---

[5] At trial, Lieutenant Justin Asher, a correctional shift commander, testified that each inmate at the Anne Arundel County Detention Center receives an individual PIN passcode to make outgoing telephone calls. Each PIN is individually assigned, and each outgoing telephone call using the PIN is timestamped and recorded with its own identification number. Lieutenant Asher testified that inmates typically use another inmate's PIN to avoid having their call traced back to them. However, another reason for using another inmate's PIN is because the caller's account lacks sufficient funds to make the call.

Listen, I said YSK / I ain't never scared / I always let it spray /
And, if a n---a ever play / Treat his head like a target /
You know he's dead today / I'm on his ass like a Navy Seal /
Man, my n----s we ain't never squeal /
I'll pop your top like an orange peel / You know I'm from the streets /
F.T.G. / You know the gutter in me /
And I be always reppin' my YSK shit / Because I'm a king /
I be playin' the block bitch / And if you ever play with me /
I'll give you a dream, a couple shots snitch /
It's like hockey pucks the way I dish out this /
It's a .40 when that bitch goin' hit up shit / 4 or 5, rip up your body quick /
Like a pickup truck / But you ain't getting picked up /
You getting picked up by the ambulance /
You going to be dead on the spot /
I'll be on your ass.

After making the recording, the male on the other end of the telephone interjected

to warn Mr. Montague about recording the lyrics and publishing them on social media, but

Mr. Montague replied: "I'm gucci.  It's a rap.  F--k they can do for—about a rap?"

### D.     The Trial and Appeal.

Among other evidence, the State sought to introduce at trial the October 7 telephone

call recording of Mr. Montague's rap lyrics.  Three days before trial, on October 23, Mr.

Montague moved *in limine* to exclude the telephone call recording of his rap lyrics because

the lyrics were "simply fiction" and their prejudicial effect "far outweigh[ed]" their

probative value.

At trial, on October 26, the Circuit Court for Anne Arundel County heard argument

on Mr. Montague's pretrial motion *in limine* and declined to exclude the recording of his

October 7 telephone call.  The circuit court found that the rap lyrics in the recording were

relevant and admitted the recording into evidence.  The prosecutor played the recording for

7

the jury throughout trial, over defense counsel's objection, and described the lyrics as a narration of Mr. Forrester's homicide.

The State also presented testimony from Ms. Tasker and Tajah Brown, the mother of Mr. Montague's child. Both testified that Mr. Montague was at Woodside Gardens on the night of the shooting. Ms. Brown testified that one of Mr. Montague's sisters lived at Woodside Gardens and that she had been staying with Mr. Montague in the sister's apartment on the night of the shooting.

In addition to the witness testimony, the State presented medical evidence about Mr. Forrester's cause of death, expert testimony that shell casings found near the site of the shooting were fired from a .40-caliber handgun, and video surveillance footage that showed a man in dark clothing running from the scene of the shooting. Ms. Tasker identified that man at trial as Mr. Montague.

Mr. Montague presented no evidence at trial and was convicted of second-degree murder, first-degree assault, use of a firearm in a crime of violence, use of a firearm in the commission of a felony, and wearing, carrying, or transporting a handgun on or about the person. Mr. Montague moved for a new trial on the ground that the circuit court did not adequately weigh the probative value of the rap lyrics against their prejudicial effect under Maryland Rule 5-403. The circuit court denied the motion for a new trial.

Mr. Montague was sentenced to a thirty-year term of imprisonment for second-degree murder and to a consecutive twenty-year term for use of a firearm in a crime of violence. His remaining convictions were merged for sentencing purposes.

8

Mr. Montague appealed his convictions to the Court of Special Appeals and raised four issues before that court—including a challenge to the admission of the rap lyrics from his detention center telephone call. *Montague v. State*, 244 Md. App. 24, 35 (2019). In a reported opinion filed on December 23, 2019, the Court of Special Appeals affirmed the circuit court and held that the rap lyrics written and recited by Mr. Montague were "a relevant statement of a party opponent, whose probative value was not substantially outweighed by any unfair prejudice caused by its admission." *Id.* at 39.

Mr. Montague filed a Petition for Writ of Certiorari, which this Court granted on March 11, 2020, to answer the following question:

> Is artistic expression, in the form of rap lyrics, that does not have a nexus to the alleged crime relevant as substantive evidence of a defendant's guilt?

*Montague v. State*, 467 Md. 690 (2020).

For the reasons below, we hold that the circuit court did not err in admitting Mr. Montague's rap lyrics under Maryland Rule 5-402. As described in further detail below, the lyrics squarely meet the relevance threshold established in Maryland Rule 5-401. The close nexus between the rap lyrics written and recited by Mr. Montague and the details of Mr. Forrester's murder, along with Mr. Montague's use of "snitch" references in the lyrics to potentially intimidate witnesses, make it more probable that Mr. Montague was the shooter. Thus, we also hold that the trial judge did not abuse his discretion in determining that the probative value of the rap lyrics is not substantially outweighed by unfair prejudice under Maryland Rule 5-403. We therefore affirm the judgment of the Court of Special Appeals.

9

**STANDARD OF REVIEW**

Our review of the trial court's decision to admit the rap lyrics as evidence involves a two-step process of analysis. First, we consider whether the evidence is legally relevant which is a conclusion of law that we review *de novo*. *Portillo Funes v. State*, 469 Md. 438, 478 (2020) (citing *Ford v. State*, 462 Md. 3, 46 (2018)) ("An appellate court reviews *de novo* a trial court's determination as to whether evidence is relevant."). After determining whether the evidence in question is relevant, we consider whether the trial court abused its discretion by admitting relevant evidence which should have been excluded as unfairly prejudicial. Thus, the trial judge's ruling on the admissibility of evidence under Rule 5-403 is reviewed for abuse of discretion. *Id.* The standard of review for "[a]n abuse of discretion occurs where no reasonable person would take the view adopted by the circuit court." *Williams v. State*, 457 Md. 551, 563 (2018) (citing *Fuentes v. State*, 454 Md. 296, 325 (2017)). Appellate "courts 'are generally loath to reverse a trial court unless the evidence is plainly inadmissible under a specific rule or principle of law or there is a clear showing of an abuse of discretion.'" *Portillo Funes*, 469 Md. at 479 (quoting *Merzbacher v. State*, 346 Md. 391, 404–05 (1997)).

**DISCUSSION**

**A.    *Relevance and Its Limits.***

The starting point for determining the admissibility of Mr. Montague's rap lyrics is relevance. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. "Having 'any tendency' to make

10

'any fact' more or less probable is a very low bar to meet." *Williams*, 457 Md. at 564 (citing *State v. Simms*, 420 Md. 705, 727 (2011)).

Generally, all relevant evidence is admissible. Md. Rule 5-402. Still, a trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice or other countervailing concerns. Md. Rule 5-403. In balancing probative value against unfair prejudice, this Court is mindful that prejudicial evidence is not excluded under Rule 5-403 only because it hurts one party's case. *Burris v. State*, 435 Md. 370, 392 (2013) (quoting *Odum v. State*, 412 Md. 593, 615 (2010)). Instead, probative value is substantially outweighed by unfair prejudice when the evidence "tends to have some adverse effect . . . beyond tending to prove the fact or issue that justified its admission." *State v. Heath*, 464 Md. 445, 464 (2019) (quoting *Hannah v. State*, 420 Md. 339, 347 (2011)). Even so, "the admission of evidence is committed to the sound discretion of the trial court." *Portillo Funes*, 469 Md. at 479 (citing *Kelly v. State*, 392 Md. 511, 530 (2006)).

## B.    *The Parties' Contentions.*

Mr. Montague contends that the recorded rap lyrics from his October 7, 2017, detention center telephone call are inadmissible under Maryland Rules 5-402 and 5-403 because they are irrelevant, and their probative value is substantially outweighed by unfair prejudice. Mr. Montague maintains that his rap lyrics bear minimal nexus to the details of Mr. Forrester's murder and are therefore "too ambiguous and unequivocal" to be relevant. According to Mr. Montague, there are "too many possible" explanations to the lyrics, and thus, they do not make it more or less probable that Mr. Montague shot and killed Mr.

11

Forrester. Mr. Montague posits that, because his lyrics stem from common rap themes, like committing violence against those who violate the "street code," the circuit court committed reversible error in admitting irrelevant evidence.[6] Even if the rap lyrics are relevant, Mr. Montague asks this Court to find that the trial judge abused his discretion in admitting the lyrics because their probative value is substantially outweighed by the danger of unfair prejudice.

The State responds that the rap lyrics are admissible under Rule 5-402 because they meet Rule 5-401's low relevance threshold and because the trial judge acted within his sound discretion in admitting the lyrics under Rule 5-403. The State contends that whether Mr. Montague shot Mr. Forrester is *the* fact of consequence in this case, and the rap lyrics from the recorded telephone call make that fact more probable. The State characterizes the rap lyrics as substantive evidence of Mr. Montague's involvement in Mr. Forrester's murder and, based on the close factual and temporal nexus between the lyrics and the murder, the State concludes that the lyrics are relevant. As a result of this close nexus, the State refutes that the trial judge abused his discretion in concluding that the probative value of the rap lyrics is not substantially outweighed by unfair prejudice.

---

[6] Mr. Montague points this Court to "Look Into My Eyes" by Bone Thugs-N-Harmony and "Guerilla" by Juvenile as representative of "consistent themes of being 'played' and enacting vengeance in rap." Moreover, Mr. Montague asks this Court to consider his rap lyrics within "the context of the genre they inhabit . . . ." While we agree that Mr. Montague's rap lyrics include violent verses—some of which mirror details of Mr. Forrester's murder—we reject the notion that rap is a genre of music that is typified by exclusively violent themes or lyrics.

## C.    *The Admissibility of Rap Lyrics*.

This Court provided guidance on the relevance of rap lyrics and the prejudicial effect that often accompanies their admission in *Hannah v. State*, 420 Md. at 339.  As the Court of Special Appeals aptly noted below, however, *Hannah* involves the admissibility of rap lyrics in the impeachment context—rather than as substantive evidence of a defendant's guilt—and is not entirely analogous to the context of this case.  In holding that Mr. Montague's rap lyrics are admissible under Rules 5-402 and 5-403, the Court of Special Appeals shaped much of its analysis by surveying several out-of-state decisions— some of which guided this Court's analysis in *Hannah*.  We find this approach instructive.  Because *Hannah* provides us with a guidepost in which we frame our analysis, we begin by turning to that decision.  Then, we review the out-of-state authority relied on by both this Court in *Hannah* and the Court of Special Appeals below.

*1.*  Hannah v. State.

In *Hannah*, we found that the circuit court abused its discretion in admitting Justin Hannah's rap lyrics as impeachment evidence because, during the State's cross-examination, Hannah's rap lyrics were introduced in an unfairly prejudicial way that only sought to highlight his propensity for violence.  420 Md. at 357.  Hannah was convicted of attempting to murder his ex-girlfriend's new boyfriend and, at trial, the State's Attorney cross-examined Hannah as to whether he ever possessed or had access to a gun.  *Id.* at 340, 343.  Hannah answered in the negative but, when he acknowledged that he had composed freestyle raps that incorporated "guns" into the lyrics, the State's Attorney sought to admit a composition notebook that contained lyrics written two years before trial.  *Id.* at 343–44.

13

The rap lyrics referred to drive-by shootings, "guns," and "burners," which the State construed as a synonym for "guns." *Id.* at 344. The composition notebook also contained a drawing of a semi-automatic nine-millimeter handgun. *Id.*

Defense counsel argued that Hannah's rap lyrics and artwork were "not relevant to the issues" before the jury and had no "probative value." *Id.* The trial judge overruled defense counsel's objection and, in a prolonged exchange, the State's Attorney repetitively cross-examined Hannah by recounting each lyric from his composition notebook:

> [State's Attorney]: One, two, three, shot ya ass jus got drop. One of your lyrics?
>
> [Hannah]: I guess so.
>
> [State's Attorney]: I ain't got guns, got a duz unda da seat. Your lyrics?
>
> [Hannah]: It's on the same paper.
>
> ***
>
> [State's Attorney]: Ya see da tinted cum down n out come da glock. Your lyrics?
>
> [Hannah]: Yes, ma'am.
>
> [State's Attorney]: What is a glock?
>
> [Hannah]: I can't say. I know it's a handgun.
>
> [State's Attorney]: Ya just got jacked, we leave da scene in da lime green. Your lyrics?
>
> [Hannah]: Yes, ma'am.
>
> [State's Attorney]: So you betta step ta me before I blow you off ya feet. Your lyrics?
>
> [Hannah]: Yes. They're the same—that's a piece of paper. I assume it's in the same book, I guess.
>
> [State's Attorney]: Bring da whole click, we put em permanently sleep. Your lyrics?
>
> [Hannah]: Yes, it's on the same paper.

14

[State's Attorney]: Wa you think, I ain't got burners, got a duz under da seat. Your lyrics?

[Hannah]: It's on the same paper, yes.

[State's Attorney]: What are burners?

[Hannah]: I can't reply. I heard that terminology in a rap song.

[State's Attorney]: Let's see. Ya talk a bunch shit n ya sure—I can't read this. So pull your f[----]n trigga n[---]a go pop, pop, one, two three shot ya ass jus got drop. Your lyrics?

[Hannah]: Yes. It's on the same paper.

[State's Attorney]: I'll put you in a funeral. Your lyrics?

[Hannah]: It's on the same paper.

\*\*\*

*Hannah*, 420 Md. at 345–46.

On appeal to this Court, we were tasked with determining whether Hannah's testimony that he had never held or fired a gun justified admitting "'rap' lyrics and associated drawings produced . . . two years before the offense which dealt with guns and violence[.]" *Id.* at 340–41. While this Court generally reviews whether a trial judge "failed to impose reasonable limits on cross-examination" for abuse of discretion, trial judges do "not have discretion to permit cross-examination that is harassing, unfairly prejudicial, confusing, or unduly repetitive." *Id.* at 347 (citing *Marshall v. State*, 346 Md. 186, 193 (1997)). We therefore determined that the circuit court abused its discretion in permitting the State to impeach Hannah with his rap lyrics because its cross-examination "unnecessarily prodded [Hannah] into conceding that he had written each of the violent lyrics" and "served no purpose other than the purpose of showing" Hannah's propensity for violence. *Id.* at 357.

15

Our holding in *Hannah* stemmed from the "multitudinous" and prejudicial nature of the State's cross-examination and the utter lack of probative value that the lyrics had as impeachment evidence. *Id.* at 358 (Harrell, J., concurring). But, in relying on some of the same out-of-state authority the Court of Special Appeals relied on, we recognized a distinction between the probative value of rap lyrics that are "admissible statements of historical fact" and the danger of unfair prejudice presented by those that are "inadmissible works of fiction." *Id.* at 348; *see Greene v. Commonwealth*, 197 S.W.3d 76 (Ky. 2006); *see also State v. Cheeseboro*, 552 S.E.2d 300 (S.C. 2001). Hannah's rap lyrics had no nexus to the details of the attempted murder, and we compared them to lyrics that were excluded by the Supreme Court of South Carolina in *Cheeseboro* for being "too vague" to support their admission. *Id.* at 349–50 (citing *Cheeseboro*, 552 S.E.2d at 313). The probative value of Hannah's rap lyrics was also undermined by an extraordinarily weak temporal nexus to the crime because they were composed two years before the crime occurred.

We considered Hannah's rap lyrics to be unfairly prejudicial because they fell within a category of "inadmissible works of fiction" that, when recounted line-by-line before the jury, only served to prejudice Hannah by casting him in a violent light. *Id.* at 348, 357. Therefore, the minimal probative value of the rap lyrics as impeachment evidence was substantially outweighed by their unfairly prejudicial effect as bad-character evidence and the lyrics were accordingly inadmissible. *Id.* at 357.

While *Hannah*'s analytical framework is instructive, as explained above, that decision is not dispositive in determining whether a defendant's rap lyrics may be relevant

16

and admissible as substantive evidence of their guilt. Although we excluded Hannah's rap lyrics, we do not read *Hannah* as foreclosing Mr. Montague's rap lyrics as improper propensity evidence that is neither relevant under Rule 5-401 nor admissible under Rule 5-403. As a practical matter, we agree with the distinction between the admissibility of rap lyrics that include "statements of historical fact" and those that are "works of fiction." *Id.* at 348. Indeed, some rap lyrics—and other artistic expressions—that have a close nexus to the details of an alleged crime should be admitted if they are relevant and survive a weighing of probative value against unfair prejudice.

## 2. Out-of-State Cases.

Using *Hannah*'s distinction between "inadmissible works of fiction" and "admissible statements of historical fact" as a guidepost, we now turn to the out-of-state authority that the Court of Special Appeals relied on in holding that Mr. Montague's rap lyrics are admissible as substantive evidence that he shot and killed Mr. Forrester. The Court of Special Appeals correctly distilled a converging analysis among various state appellate courts: the probative value of a defendant's rap lyrics spikes—and consequently, the danger of unfair prejudice decreases—when "a strong nexus [exists] between specific details of the artistic composition and the circumstances of the offense for which the evidence is being adduced."[7] *State v. Skinner*, 95 A.3d 236, 251–52 (N.J. 2014); *see Burris*,

---

[7] Binimow's *Admissibility of Rap Lyrics or Videos in Criminal Prosecutions* provides a comprehensive collection of relevant decisions. *See* Jason B. Binimow, Annotation, *Admissibility of Rap Lyrics or Videos in Criminal Prosecutions*, 43 A.L.R.7th Art. 1 (2019).

435 Md. at 392 ("The more probative the evidence . . . the less likely it is that the evidence will be unfairly prejudicial.") (citations and internal quotation marks omitted). We agree with this analysis and follow the various courts that have, despite divergent outcomes, kept open the door for trial courts to admit rap lyrics as substantive evidence of a defendant's guilt.

We begin with two cases where defendant-authored rap lyrics were determined to be unfairly prejudicial and inadmissible. First, in *State v. Skinner*, the Supreme Court of New Jersey found rap lyrics composed by Vonte Skinner inadmissible because the lyrics lacked a sufficient nexus to the alleged crime. 95 A.3d at 253. Skinner was indicted for attempted murder and other charges related to the shooting of Lamont Peterson, and police obtained a warrant to search Skinner's car. *Id.* at 239–40. Officers discovered three notebooks filled with "profane and violent" rap lyrics—most of which were "written in the first person under the moniker 'Real Threat[.]'" *Id.* at 240. Many of Skinner's rap lyrics were composed "long before" the shooting took place, and some were composed in connection with a rap label. *Id.*

Before trial, Skinner objected to the introduction of his rap lyrics under N.J. R. Evid. 404(b),[8] which prohibits propensity evidence to prove a defendant's bad character. *Id.* at

---

[8] New Jersey Rule of Evidence 404(b), much like Maryland Rule 5-404(b), is based on Federal Rule of Evidence 404. Maryland Rule 5-404(b) states in pertinent part:

> Evidence of other crimes, wrongs, or other acts . . . is not admissible to prove the character of a person in order to show action in the conformity therewith. Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan,

18

240–41; *see* N.J. R. Evid. 404(b) (prohibiting "evidence of other crimes, wrongs, or acts . . . to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition"). The trial court disagreed and admitted redacted portions of the rap lyrics into evidence because they went to Skinner's alleged motive and intent. *Id.* Skinner's first trial resulted in a mistrial and, at his second trial, a police officer read excerpts from the rap lyrics that amounted to thirteen uninterrupted pages of testimony in the trial record. *Id.* at 241.

Skinner was convicted and, on appeal, the New Jersey Supreme Court held that the trial court erred in admitting the rap lyrics. *Id.* at 253. The court found that, although Skinner's lyrics "plainly depict[ed] various crimes and other bad acts, . . . those crimes and acts were unconnected to the specific facts of the attempted-murder charge[.]" *Id.* at 241. The court also noted that "[t]he State did not attempt to clarify or explain the lyrics in any way, despite their heavy use of slang and otherwise esoteric language." *Id.* Accordingly, the court held that Skinner's "graphically violent" lyrics were inadmissible under N.J. R. Evid. 404(b) because, "absent a strong nexus between specific details of the artistic composition and the circumstances of the offense" in which Skinner was charged, the lyrics were only being offered to prove that he had "a propensity toward committing, or at the very least glorifying, violence and death." *Id.* at 251–52.

---

knowledge, identity, absence of mistake or accident, or in conformity with Rule 5-413.

19

In holding so, the court balanced the probative value of Skinner's rap lyrics against the danger of unfair prejudice under N.J. R. Evid. 403. *Id.* at 238, 253 ("We hold that the violent, profane, and disturbing rap lyrics that defendant wrote constituted highly prejudicial evidence against him that bore little or no probative value on any motive or intent behind the attempted murder offense with which he was charged."). Skinner's rap lyrics lacked an "unmistakable factual connection" to the details of the attempted murder and therefore "risked unduly prejudicing the jury without much, if any, probative value." *Id.* at 252–53.

Given this backdrop, the New Jersey Supreme Court suggested that courts approach rap lyric evidence with "caution," although the court did not foreclose the admissibility of rap lyrics as substantive evidence of a defendant's guilt. *Id.* at 249 n.5, 253. When "rap lyric evidence . . . provides direct proof against a defendant[,] such as an admission or details that are not generally known and dovetail with the facts of the case[,]" the court found that those lyrics may be admissible if they are relevant and their probative value is not substantially outweighed by unfair prejudice. *Id.* at 249 n.5.

The second case is *State v. Cheeseboro*, which this Court cited in *Hannah* because the South Carolina Supreme Court faced similar facts in holding that Felix Cheeseboro's rap lyrics were improperly admitted during his murder trial. 552 S.E.2d at 312–13. Cheeseboro, an aspiring rap artist, was accused of several crimes, including murder, for killing two people during an attempted robbery at a barbershop. *Id.* at 304–05. While Cheeseboro was incarcerated and awaiting trial, prison officials seized violent and profane rap lyrics from his jail cell that included:

20

Like the 4th of July, I spray fire in the sky. If I hear your voice, better run like horses or like metamorphis, turn all y'all to corpses. No fingerprints or evidence at your residence. Fools leave clues, all I leave is a blood pool. Ten murder cases, why the sad faces? Cause when I skipped town, I left a trail [of] bodies on the ground.

*Id.* at 312 (alteration in original).

The State sought to introduce the rap lyrics into evidence over defense counsel's objection that the lyrics constituted improper character evidence. *Id.* at 312. The trial court admitted the lyrics. *Id.* at 313. The South Carolina Supreme Court reversed and held that the trial court erred in admitting the rap lyrics as an admission against interest under S.C. R. Evid. 801(d)(2). *Id.* The trial court admitted the rap lyrics based on their "reference to leaving no prints and bodies left in a pool of blood." *Id.* However, the South Carolina Supreme Court found the lyrics "too vague in context to support" their admission. *Id.*

Much like the New Jersey Supreme Court in *Skinner*, the South Carolina Supreme Court grounded its holding through a balancing of the probative value of the rap lyrics against their prejudicial effect. Where the rap lyrics had substantial prejudicial effect as propensity evidence against Cheeseboro, the court found that the "minimal probative value" of the lyrics was "far outweighed by [their] unfair prejudicial impact as evidence of [Cheeseboro's] bad character[.]" *Id.* The court held that the rap lyrics should have been excluded under S.C. R. Evid. 403 because the lyrics only included "general references glorifying violence." *Id.*

Faced with facts that are distinguishable from *Skinner* and *Cheeseboro*, appellate courts have allowed the admission of rap lyrics as substantive evidence of a defendant's guilt when the lyrics have a close nexus to the details of the alleged crime.

21

In *Greene v. Commonwealth*, a Kentucky case that this Court also cited in *Hannah*, Dennis Greene's rap lyrics were admissible as evidence that he stabbed and killed his wife. 197 S.W.3d at 87. After the murder, Greene fled to Chicago and made several rap videos with his friends, some of which included details about his wife's death. *Id.* at 80. At trial, the prosecution sought to introduce a seven-minute video that included Greene's rap lyrics about killing his wife:

> B---- made me mad, and I had to take her life. My name is Dennis Greene and I ain't got no f---ing wife. I knew I was gonna be givin' it to her . . . when I got home. I cut her motherf---in' neck with a sword . . .

*Id.* at 86 (cleaned up).

Greene argued that the video containing the rap lyrics was inadmissible under Kentucky Rule of Evidence ("KRE") 404(b) because the lyrics constituted impermissible character evidence that only went to Greene's propensity for violence. *Id.* at 86. Greene also maintained that the substantial prejudicial effect of the rap lyrics precluded their admission under KRE 403. *Id.* The trial court disagreed and admitted the seven-minute video containing Greene's rap lyrics into evidence. *Id.*

On appeal, the Supreme Court of Kentucky affirmed the trial court's admission of the rap lyrics because, even as propensity evidence, the probative value of Greene's lyrics outweighed the danger of unfair prejudice. The court explained that propensity evidence of a defendant's bad character is not automatically excluded because it is irrelevant. *Id.* at 87. Rather, propensity evidence is typically excluded because its probative value tends to be substantially outweighed by unfair prejudice. *Id.* Given the relationship between KRE 404(b) and 403, the court provided three reasons why Greene's rap lyrics did not fall into

22

the category of bad acts evidence that is typically excluded because of its prejudicial effect: "[1] the video refer[red] to [Greene's] actions and emotions regarding [the] crime, not a previous offense, [2] the video shed[] light on [Greene's] . . . mental state shortly after the killing, and [3] the video establishe[d] premeditation and motive in [Greene's] own words." *Id.* The court thus held that the rap lyrics were admissible under both KRE 404(b) and 403. *Id.*

The Nevada Supreme Court considered similar facts in *Holmes v. State*, when Deyundrea Holmes' rap lyrics mirrored the details of a robbery and murder where the assailants wore ski masks, turned out the victim's pockets, and tore a necklace from the victim's throat. 306 P.3d 415, 417 (Nev. 2013). While incarcerated in California and awaiting extradition to Nevada to face trial, Holmes composed rap lyrics that included:

> But now I'm uh big dog, my static is real large. Uh neighborhood super star. Man I push uh hard line. My attitude shitty n[---]a you don't want to test this. I catching slipping at the club and jack you for your necklace. F[--]k parking lot pimping. Man I'm parking lot jacking, running through your pockets with uh ski mask on straight laughing.

*Id.* at 418. Although the trial court acknowledged that admitting Holmes' rap lyrics carried the risk of them "being misunderstood or misused as criminal propensity" evidence, it found that the close factual nexus between the lyrics and the details of the crime justified their admission with a limiting instruction. *Id.* at 418–19.

The Nevada Supreme Court agreed with the trial court that "defendant-authored rap lyrics 'may employ metaphor, exaggeration, and other artistic devices,' . . . and can involve 'abstract representations of events or ubiquitous storylines.'" *Id.* at 419 (quoting Andrea Dennis, *Poetic (In) Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence*, 31

Colum. J. L. & Arts 1, 14, 26 (2007)). In affirming the trial court's decision to admit the rap lyrics, however, the Nevada Supreme Court found that those considerations did not outweigh the nexus between Holmes' lyrics and the alleged crime. *Id.* (citing *United States v. Stuckey*, 253 Fed. Appx. 468, 482 (6th Cir. 2007) (finding that rap lyrics describing killing government witnesses, shooting snitches, wrapping bodies in blankets, and dumping bodies in the street were relevant because they mirrored the prosecution's theory of the case)).

The Nevada Supreme Court also disagreed with Holmes' argument that defendant-authored rap lyrics should be subject to heightened admissibility requirements. *Id.* The court observed that "[r]ap is no longer an underground phenomenon" and looked to Judge Harrell's concurrence in *Hannah* for guidance on how courts should approach the admissibility of rap lyrics:

> [C]ourts should be . . . unafraid to apply firmly-rooted canons of evidence law, which have well-protected the balance between probative value and prejudice in other modes of communication. Undoubtedly, rap lyrics often convey a less than truthful accounting of the violent or criminal character of the performing artist or composer. . . . [But t]here are certain circumstances . . . where the lyrics possess an inherent and overriding probative purpose. One circumstance would be where the lyrics constitute an admission of guilt, but others would include rebutting an offered defense and impeaching testimony. Although there is no definitive line that demarcates the amount of content of lyrics that may be used appropriately, reasonableness should govern.

*Id.* (quoting *Hannah*, 420 Md. at 361–62 (Harrell, J., concurring)) (some alteration added).[9] Holmes' rap lyrics "tended to prove his involvement in the charged robbery" because they "included details that matched the crime[.]" *Id.* at 418–19. For that reason, the Nevada Supreme Court held that it "was not unreasonable" for the trial court to admit the rap lyrics as evidence that Holmes committed the alleged crime. *Id.* at 419–20.

### 3. *Application of the Relevance Rules to Rap Lyrics.*

Two guiding principles are discernable from *Hannah* and the previously cited appellate decisions that have addressed the admissibility of rap lyrics as substantive evidence of a defendant's guilt: (1) even when probative, rap lyric evidence has inherent prejudicial effect, and; (2) the probative value of rap lyric evidence may outweigh that prejudicial effect when the lyrics bear a close nexus to the details of the alleged crime. We address both principles in turn.

It is undeniable that decisions like *Skinner* and *Cheeseboro* demonstrate the inherent risk of unfair prejudice that accompanies admitting a defendant's rap lyrics as substantive evidence of their guilt. No matter how easily the State may meet the low relevance threshold when offering a defendant's rap lyrics as evidence, "[t]he admission of [a]

---

[9] The Court of Special Appeals below also cited to additional state and federal decisions where courts have admitted rap lyrics into evidence. *See United States v. Recio*, 884 F.3d 230, 235 (4th Cir. 2018); *United States v. Moore*, 639 F.3d 443, 447–48 (8th Cir. 2011); *United States v. Belfast*, 611 F.3d 783, 819–20 (11th Cir. 2010); *United States v. Foster*, 939 F.2d 445, 456 (7th Cir. 1991); *Cook v. State*, 45 S.W.3d 820, 822–23 (Ark. 2001); *Taylor v. State*, 76 A.3d 791, 802 (Del. 2013)*; Tann v. United States*, 127 A.3d 400, 468–69 (D.C. 2015); *Taylor v. State*, 772 S.E.2d 630, 633–34 (Ga. 2015); *Bryant v. State*, 802 N.E.2d 486, 489 (Ind. App. 2004); *People v. Hayes*, 168 A.D.3d 489 (N.Y. App. Div. 2019).

25

defendant's inflammatory rap verses . . . risk[s] poisoning the jury against [the] defendant." *Skinner*, 95 A.3d at 238. Even in reaching a different result than *Skinner* and *Cheeseboro*, the *Holmes* court recognized that rap lyrics carry "the risk of . . . being misunderstood or misused as criminal propensity or 'bad act' evidence." *Holmes*, 306 P.3d at 418 (citing Dennis, *supra*, at 1, 18, 22, 25–26); *see Skinner*, 95 A.3d at 238 (describing rap music as "a genre that certain members of society view as art and others view as distasteful and descriptive of a mean-spirited culture").

The danger of unfair prejudice is of particular concern when a defendant's rap lyrics are "insufficiently tethered" to the details of the alleged crime. *Skinner*, 95 A.3d at 253. In such a case, rap lyrics that include "only general references glorifying violence[,]" even if they pass the low relevance threshold, should be excluded because their "minimal probative value . . . is far outweighed by [their] unfair prejudicial impact" as propensity evidence of the defendant's bad character. *Cheeseboro*, 552 S.E.2d at 313. Though in a different context, this falls squarely in line with this Court's distinction between the probative value of rap lyrics that are "admissible statements of historical fact" and those that are "inadmissible works of fiction." *Hannah*, 420 Md. at 348. Rap lyric evidence that is fictional and bears no nexus to the details of an alleged crime is not relevant under Rule 5-401, nor is it admissible under Rule 5-403.

That is not to say, as reflected in *Greene* and *Holmes*, that a defendant's rap lyrics cannot both overcome the low relevance threshold and survive a weighing of probative value against unfair prejudice. Courts have addressed the inherent prejudice presented by admitting rap lyrics into evidence by, as Judge Harrell suggests in his concurrence in

26

*Hannah*, applying "firmly-rooted canons of evidence law[.]" 420 Md. at 361 (Harrell, J., concurring).

In doing so, courts have shown little reservation in admitting rap lyrics as substantive evidence of a defendant's guilt when there is a "strong nexus between the specific details of the artistic composition and the circumstances of the offense for which the evidence is being adduced." *Skinner*, 95 A.3d at 251–52. When such a nexus exists, and a jury can "reasonably view the lyrics as factual, not fictional," the risk of improperly admitting the lyrics as propensity evidence of the defendant's bad character significantly decreases. *Holmes*, 306 P.3d at 418. That risk decreases because, rather than serving as inadmissible propensity evidence, rap lyrics that "describe details that mirror the crime charged" have heightened probative value as "direct proof" that the defendant committed the crime. *Id.* at 419; *Skinner*, 95 A.3d at 249 n.5. In other words, rap lyrics that have a close factual nexus to the details of an alleged crime, such that their heightened probative value outweighs unfair prejudice, may be offered by the State as an admission to prove the defendant's involvement in that crime.

Courts have also recognized that a close temporal nexus bolsters the admissibility of rap lyric evidence. The New Jersey Supreme Court recognized the significance of a close temporal nexus in balancing the probative value of Skinner's rap lyrics against the danger of unfair prejudice that accompanied their admission. *Skinner*, 95 A.3d at 251. Because the rap lyrics in *Skinner* were composed well before trial, and some were composed in connection with a rap label, a weak temporal nexus between the lyrics and the alleged crime cut against their probative value and accentuated their prejudicial effect.

27

*Id.* While not explicitly stated, the rap lyrics in *Hannah* were less probative as impeachment evidence because they were composed years before the State sought to admit them. 420 Md. at 341. On the other hand, the probative value of rap lyrics increases when, like the lyrics in *Holmes* and *Greene*, they are composed after the alleged crime is committed. 306 P.3d at 418; 197 S.W.3d at 86–87. When a defendant's rap lyrics are composed after the alleged crime occurs, the lyrics have a closer temporal nexus to that crime and are therefore more probative of the defendant's involvement.

Likewise, the nexus between a defendant's rap lyrics and the details of an alleged crime is strengthened—and thus probative value is heightened—when the lyrics contain "stop snitching" references that are recorded and released as a witness intimidation tactic.[10] This "stop snitching" theme was highlighted in the State's closing argument at trial:

---

[10] "Stop snitching," or "no snitching," is a phenomenon that arose out of rap lyrics in the late 1990s and is still prevalent today. *See* Jamie Masten, Note, *"Aint No Snitches Ridin' Wit' Us": How Deception in the Fourth Amendment Triggered the Stop Snitching Movement*, 70 Ohio St. L.J. 705, 706 (2009) (explaining how the "stop snitching" movement has "gathered a whole generation of teens and young adults who are refusing to talk to the police—even when they are innocent witnesses to violent crime"). This phenomenon gained further prevalence, both in Baltimore City and nationally, after NBA star—and former Baltimore resident—Carmelo Anthony appeared in a 2004 DVD titled "Stop Snitching." Stephanie Hanes, *'Snitch' DVD is aimed at suspected ex-drug boss*, Balt. Sun. (Dec. 8, 2004), https://www.baltimoresun.com/bal-stewart1208-story.html [https://perma.cc/NB2Z-N74T]. Mr. Montague's rap lyrics align with this "stop snitching" culture—one that encourages silence and threatens retribution against those who cooperate with law enforcement. *See* Matthew Dolan, *Dawson family survivors file lawsuit against officials, police*, Balt. Sun. (Feb. 18, 2005), https://www.baltimoresun.com/bal-dawson0218-story.html [https://perma.cc/J933-HSNE] (detailing the firebombing and murder of seven family members for allegedly speaking out against neighborhood drug dealers).

28

Officer Mann told you about his canvass, you heard about the canvass of this area from quite a few witnesses. And the consensus from Officer Mann[] [and] Detective Bealefeld is that it's not always easy to get cooperation from witnesses in this area[.] Officer Mann told you at one point he was told along the lines of go f--k yourself. He wasn't going to get any help from that particular person who he came in contact with.

Moreover, Mr. Montague argues that the "stop snitching" references in his lyrics are "best viewed" as generic rap verses that are ubiquitous to the genre. However, when a defendant's rap lyrics contain "stop snitching" references that are published on social media just three weeks before trial to potentially intimidate witnesses, the lyrics are not automatically generic, vague, and inadmissible. When an otherwise close factual and temporal nexus exists between defendant-authored rap lyrics and an alleged crime, the inclusion of "stop snitching" references may support the admissibility of the lyrics as substantive evidence.

We recognize that "stop snitching" is a theme that is common to rap as a genre and, like rap music generally, may be misinterpreted by a jury and improperly used as propensity evidence. However, we disagree that "stop snitching" references always undermine the probative value of rap lyric evidence. Rap lyrics that have a factual and temporal nexus to the details of an alleged crime are *more* probative of a defendant's guilt when those same lyrics contain "stop snitching" references that are published to threaten witnesses to the crime.

As explained in *Holmes*, the danger of unfair prejudice when admitting a defendant's rap lyrics is alleviated when a close nexus between the lyrics and the alleged crime justifies their admission. When a defendant's rap lyrics have an otherwise close

nexus to an alleged crime, the inclusion of "stop snitching" references that explicitly or implicitly threaten witnesses strengthens that nexus. In such a case, defendant-authored rap lyrics become increasingly probative of the defendant's guilt because the threats recited in the lyrics make it more probable that the defendant committed the crime.[11]

Given these principles, applying the Maryland Rules to a defendant's rap lyrics is straightforward. If defendant-authored rap lyrics bear a close nexus to the details of an alleged crime such that the lyrics constitute "direct proof" of the defendant's involvement, they meet the low relevance threshold of Maryland Rule 5-401 and are admissible under Maryland Rule 5-402. Then, the relevance inquiry shifts to a balancing of probative value against unfair prejudice under Maryland Rule 5-403. Similarly, when such a nexus exists, the probative value of defendant-authored rap lyrics is not substantially outweighed by unfair prejudice because the usefulness of the lyrics to the jury is not substantially overcome by their inflammatory character as propensity evidence. *Holmes*, 306 P.3d at

---

[11] Much like rap lyric evidence, witness intimidation evidence is often considered and admitted as "consciousness of guilt" evidence that is subject to the admissibility requirements of Rule 404(b). *See, e.g.*, *Copeland v. State*, 196 Md. App. 309, 316–17 (2010). However, courts have also admitted evidence of witness intimidation as "direct evidence of the crime charged," without considering Rule 404(b), so long that the evidence is not unfairly prejudicial under Rule 403. *United States v. Skarda*, 845 F.3d 370, 378 (8th Cir. 2016) (quoting *United States v. Castleman*, 795 F.3d 904, 915 (8th Cir. 2015)). Regardless of whether witness intimidation evidence has stand-alone significance as substantive evidence of a defendant's guilt, Mr. Montague was not charged with witness tampering or obstruction of justice. We only consider the "stop snitching" aspect of Mr. Montague's rap lyrics given that, when lyrics include threats against a witness to an alleged crime, those threats strengthen the nexus between the defendant's lyrics and the alleged crime.

30

420; *see Greene*, 197 S.W.3d at 87 (explaining the relationship between propensity evidence and its typical exclusion under Rule 403).

In sum, when a defendant's rap lyrics are offered as substantive evidence of their guilt, those lyrics should be analyzed on a case-by-case basis using the evidentiary rules that courts routinely use in determining the threshold admissibility of evidence. Although rap lyric evidence carries inherent prejudicial effect, the probative value of a defendant's rap lyrics shares an inverse relationship with unfair prejudice. The closer the nexus between a defendant's rap lyrics and the details of an alleged crime, the lower the danger of admitting the lyrics as unfairly prejudicial propensity evidence of the defendant's bad character.

### D. *Mr. Montague's Rap Lyrics Are Relevant and Admissible.*

Using these guiding principles and applying "firmly rooted canons of evidence law," we hold that Mr. Montague's lyrics are relevant under Maryland Rule 5-401 and admissible under Maryland Rules 5-402 and 5-403. Although Mr. Montague's rap lyrics include some thematic elements native to rap as a genre, and do not recount every detail of Mr. Forrester's murder, the lyrics are relevant because they bear a close factual and temporal nexus to the details of Mr. Forrester's murder. That nexus is strengthened by the fact that Mr. Montague's rap lyrics include "stop snitching" references that, when recorded and uploaded on Instagram, serve as a vehicle to potentially intimidate witnesses to the murder. Mr. Montague's lyrics "describe details that mirror" the circumstances surrounding Mr. Forrester's murder and, given Mr. Montague's request to have the "stop

31

snitching" lyrics put on Instagram, "tend[] to prove his involvement" in the crime. *Holmes*, 306 P.3d at 418, 419.

In chronologically recounting the details of Mr. Forrester's murder, Mr. Montague's rap lyrics begin with: "And, if a n---a ever play / Treat his head like a target / You know he's dead today." The first verse is a reference to Mr. Forrester's attempt to "play," or cheat, Mr. Montague by purchasing cocaine using counterfeit money. The next two verses are an acknowledgment that Mr. Montague shot at Mr. Forrester, as if he were "a target," for trying to "play" him during the drug transaction. Shortly after Mr. Forrester "played" Mr. Montague, he was shot to death—just as the lyrics recount.

Mr. Montague's rap lyrics go on to state: "It's a .40 when that bitch goin' hit up shit." At trial, the State compared the ".40" referenced in Mr. Montague's lyrics with the .40-caliber handgun that was used in Mr. Forrester's murder. The State proffered that a ".40," in the context of Mr. Montague's rap lyrics, is shorthand for a .40-caliber handgun. Officers located two .40-caliber shell casings at the scene of Mr. Forrester's murder. Much like Mr. Montague's previous verses, the State contends that this verse is factually on point with the details of the murder and demonstrates Mr. Montague's acknowledgment that, when he shot and killed Mr. Forrester, he used a .40-caliber handgun to do so.

The State also proffered that Mr. Montague's rap lyrics describe the scene of the shooting as Mr. Forrester lay unresponsive in the parking lot in front of 708 Newtowne. Officer Artigues testified at trial that, after she arrived on scene and provided medical attention to an unconscious Mr. Forrester, she "saw that he left in the ambulance." Mr. Montague's rap lyrics include: "You getting picked up by the ambulance / You going to be

32

dead on the spot." The State argued that these verses are an acknowledgement by Mr. Montague that Mr. Forrester was picked up by an ambulance after being shot and was pronounced deceased upon arriving at the hospital. Just as in *Greene* and *Holmes*, Mr. Montague's rap lyrics have heightened probative value as substantive evidence of his guilt because a close factual nexus exists between the lyrics and the details of Mr. Forrester's murder.

Moreover, the probative value of Mr. Montague's rap lyrics is compounded by a close temporal nexus to Mr. Forrester's murder. Mr. Montague is not an "aspiring rap artist" like the defendant in *Cheeseboro*, 552 S.E.2d at 305. Instead, Mr. Montague's rap lyrics were recorded in the Anne Arundel County Detention Center less than a year after the murder occurred and three weeks before trial. Thus, Mr. Montague's rap lyrics are distinguishable from the lyrics in *Hannah* and *Skinner* that predated the alleged crime. Instead, Mr. Montague's rap lyrics are more closely comparable to those that were composed after the alleged crime and admitted in *Greene* and *Holmes*. Because Mr. Montague's lyrics were composed after Mr. Forrester's murder, their close temporal nexus to the crime furthers their probative value as substantive evidence of his guilt.

Likewise, Mr. Montague's rap lyrics have heightened probative value because they were recorded and uploaded as a vehicle to potentially intimidate witnesses. Lyrics such as: "And if you ever play with me / I'll give you a dream, a couple shots snitch," reveal an attempt by Mr. Montague to threaten witnesses, like Ms. Tasker, and dissuade them from testifying against him.

33

Taken alone, these rap lyrics may fall within a category of generic "stop snitching" lyrics that are prevalent in rap music as a genre. That, however, is not the case here. Ms. Tasker testified that Mr. Montague had threatened her once before by calling her a "f----n' rat" in the medical unit of the Jennifer Road Detention Center. More importantly, Mr. Montague requested that the unidentified male on his October 7, 2017, telephone call record his rap lyrics and upload them to Instagram. When the unidentified male on the call warned Mr. Montague about reciting his rap lyrics, because they could be used as evidence against him, Mr. Montague countered: "I'm gucci. It's a rap. F--k they can do for—about a rap?"

Given the close factual and temporal nexus between the rap lyrics and the details of Mr. Forrester's murder, the inclusion of "stop snitching" references to potentially intimidate witnesses makes the lyrics more probative of Mr. Montague's involvement in the crime. Rather than weakening the probative value of Mr. Montague's rap lyrics, his attempt to have the "stop snitching" lyrics recorded and uploaded on social media as a witness intimidation tactic makes it more probable that he shot and killed Mr. Forrester.[12]

---

[12] Mr. Montague's rap lyrics include slang and abbreviations that, when taken in context with the rest of the lyrics, add to their relevance. "Slang is so prevalent in rap that it supports a cottage industry of online and even print lexicons, the most prominent of which is the Web-based 'Urban Dictionary.'" Adam Bradley, et al., *The Anthology of Rap* xxxvii (Yale University Press 2010). For example, Mr. Montague rapped: "And I be always reppin' my YSK shit." "YSK" is often used as an abbreviation for "you should know," which describes a type of person who "is loyal to his code." *YSK, Urban Dictionary*, https://www.urbandictionary.com/define.php?term=YSK [https://perma.cc/9UCW-ESTG] (last visited Dec. 11, 2020). This is likely a reference to Mr. Montague being loyal to the street code that he raps about. "YSK," in the context of social media sites like Twitter and Instagram, can also mean "Young Savage Kid." *Id.* In this context, it is likely that

34

The relevance inquiry under Rule 5-401 sets out "a very low bar" to the admissibility of evidence. *Williams*, 457 Md. at 564 (citing *Simms*, 420 Md. at 727). To be relevant under Rule 5-401, evidence only needs to have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Based on the close nexus between Mr. Montague's rap lyrics and the details of Mr. Forrester's murder, Mr. Montague's lyrics make it more probable that he shot and killed Mr. Forrester. Mr. Montague's rap lyrics therefore exceed the low relevance threshold set out in Rule 5-401 and are admissible under Rule 5-402.

As a result of this close nexus, we also hold that the trial judge did not abuse his discretion in admitting Mr. Montague's rap lyrics under Rule 5-403. To reverse the trial judge's decision to admit Mr. Montague's rap lyrics, that decision must be "well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *Faulkner v. State*, 468 Md. 418, 460 (2020) (quoting *King v. State*, 407 Md. 682, 697 (2009)). Based on the evidence before the trial judge, and the State's proffer that Mr. Montague's rap lyrics mirror details of Mr. Forrester's murder, the trial judge's decision to admit the rap lyrics does not warrant reversal.

---

Mr. Montague was referring to himself when he included "YSK" in his lyrics. Moreover, when Mr. Montague rapped "F.T.G.," he was likely using an abbreviation for "f--k that guy." *FTG, Urban Dictionary*, https://www.urbandictionary.com/define.php?term=FTG [https://perma.cc/ES9A-KDJC] (last visited Dec. 11, 2020). Given the factual connection between Mr. Montague's rap lyrics and Mr. Forrester's murder, "F.T.G." was likely a reference to Mr. Forrester.

When evidence is excluded under Rule 5-404(b) as improper propensity evidence, that evidence is excluded because its probative value is substantially outweighed by the danger of unfair prejudice under Rule 5-403.[13]  Therefore, to admit Mr. Montague's rap lyrics, the circuit court was required to determine whether the probative value of the lyrics is substantially outweighed by the danger of unfair prejudice that may accompany their admission.  That danger "'must not simply outweigh 'probative value' but must, as expressly directed by Rule 5-403, do so '*substantially*.'"  *Molina v. State*, 244 Md. App. 67, 135 (2019) (quoting *Newman v. State*, 236 Md. App. 533, 555 (2018)) (emphasis added).

In *Hannah*, we excluded Hannah's rap lyrics because they were highly prejudicial and "*probative of no issue* other than the issue of whether he ha[d] a propensity for violence."  420 Md. at 355 (emphasis added).  In that case, it was clear that Hannah's rap lyrics were not useful to the jury in its determination of guilt because the lyrics "had *no tendency to prove any issue*" in the case.  *Id.* at 357 (emphasis added).  When defendant-authored rap lyrics are "probative of no issue" in the case and have "no tendency to prove"

---

[13] The Court of Special Appeals below correctly explained the relationship between Rule 404(b) and the balancing test laid out in Rule 5-403.  A circuit court's decision to admit or exclude propensity evidence under Rule 5-404(b), like other special relevance rules, is a "particularized application[] of the balancing test notion" of Rule 5-403.  Norman M. Garland, *An Overview of Relevance and Hearsay: A Nine Step Analytical Guide*, 22 Sw. U. L. Rev. 1039, 1047 (1993); *see* 5 Lynn McLain, *Maryland Evidence State and Federal* § 403:1 (3d ed. 2013) ("Md. Rule 5-403 is, at bottom, a general summary of the considerations that went into formulating the more specific rules of exclusion . . . ."); *see also* 1 *McCormick on Evid.* § 185 (7th ed. 2016) ("In certain areas, such as proof of character, comparable situations recur so often that relatively particularized rules channel the exercise of discretion.").

that the defendant committed the alleged crime, the considerable prejudicial effect presented by admitting the lyrics substantially outweighs probative value and the lyrics are inadmissible.

Although Mr. Montague's rap lyrics "'employ metaphor, exaggeration, and other artistic devices,'" the lyrics are distinguishable from those in *Hannah*. *Holmes*, 306 P.3d at 419 (quoting Dennis, *supra*, at 14). Mr. Montague's rap lyrics are probative of his guilt because they tend to prove that he was the drug dealer who shot and killed Mr. Forrester. Mr. Montague's rap lyrics are probative of his involvement because, as we explain above, they bear a close nexus to the details of the murder. Such a nexus exists between the rap lyrics and Mr. Forrester's murder because the lyrics mirror details of the murder, were composed after the murder occurred, and included "stop snitching" references that were published to potentially intimidate witnesses to the murder. The existence of such a close nexus heightens the probative value of Mr. Montague's rap lyrics and diminishes the danger of unfair prejudice that may accompany their admission. Based on the close nexus between Mr. Montague's rap lyrics and the murder, the probative value of the lyrics is not substantially outweighed by the danger of unfair prejudice.

Accordingly, the circuit court correctly weighed the heightened probative value of Mr. Montague's rap lyrics against the reduced danger of unfair prejudice presented by their admission. Reasonable minds may differ, however, it cannot be said that "no reasonable person would take the view adopted by the circuit court." *Williams*, 457 Md at 563 (citing *Fuentes*, 454 Md. at 325). While rap lyric evidence often has prejudicial effect as improper propensity evidence of a defendant's bad character, those concerns are diminished when

37

the lyrics are so akin to the alleged crime that they serve as "direct proof" of the defendant's involvement. *Skinner*, 95 A.3d at 249 n.5. Mr. Montague's rap lyrics have heightened probative value as "direct proof" of his involvement in Mr. Forrester's murder and are therefore admissible under Rule 5-403.

## CONCLUSION

Given the close nexus between Mr. Montague's rap lyrics and the details of Mr. Forrester's murder, the lyrics make it more probable that Mr. Montague was the shooter. Accordingly, Mr. Montague's rap lyrics are relevant under Maryland Rule 5-401 and admissible under Maryland 5-402. We also find that, as a result of this close nexus, the circuit court did not abuse its discretion in admitting Mr. Montague's rap lyrics under Maryland Rule 5-403. Mr. Montague's rap lyrics have heightened probative value that is not substantially outweighed by unfair prejudice as propensity evidence of Mr. Montague's bad character and are therefore admissible.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

Circuit Court for Anne Arundel County
Case No. C-02-CR-17-000378

Argued: September 14, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 75

September Term, 2019
_____

LAWRENCE ERVIN MONTAGUE

v.

STATE OF MARYLAND
_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.
_____

Dissenting Opinion by Watts, J.
_____

Filed: December 23, 2020

Respectfully, I dissent.  In this case, the majority opinion affirms the judgment of the Court of Special Appeals because, in its view, the Circuit Court for Anne Arundel County did not abuse its discretion in admitting rap lyrics composed by Lawrence Ervin Montague, Petitioner, that were profane, laced with generic statements of violence, and contained general threats against people who could be labeled snitches.[1]  The majority opinion essentially establishes a new rule in Maryland for the admission of rap lyrics/songs against criminal defendants at trial.  The standard set by the Majority is broader or more permissive than that used in other jurisdictions and conflicts with this Court's analysis in Hannah v. State, 420 Md. 339, 23 A.3d 192 (2011).  Most importantly, the standard deployed by the Majority will permit the admission of rap lyric/songs as evidence where the probative value of such evidence is outweighed by the danger of unfair prejudice to the

---

[1]While it is accurate that rap music may contain lyrics glorifying violence, rap music is far more diverse, and often contains themes promoting justice, unity, and equality.  For example, Chance the Rapper is well known for his many upbeat, optimistic songs.  See Chris Richards, *Did Chance the Rapper get boring? Or did we just get bored?*, The Washington Post (July 31, 2019), available at https://www.washingtonpost.com/ lifestyle/style/did-chance-the-rapper-get-boring-or-did-we-just-get-bored/2019/07/30/ee 88a53e-b2f7-11e9-951e-de024209545d_story.html [https://perma.cc/EE73-HGRU].  The Maryland-based rapper Logic produced a song entitled "1-800-273-8255," which was named after the number of the National Suicide Prevention Lifeline, and was intended to encourage people with suicidal thoughts to seek help.  See Bethonie Butler, *The story behind Logic's powerful suicide prevention anthem '1-800-273-8255'*, The Washington Post (Aug. 28, 2017), available at https://www. washingtonpost.com/news/arts-and-entertainment/wp/2017/08/28/the-story-behind-logics-powerful-suicide-prevention-anthem-1-800-273-8255/ [https://perma.cc/HFC6-NNJU].  Recently, the rapper Common produced a song entitled "Say Peace," which he intended to uplift listeners.  See Jon Blistein, *Common Seeks Serenity on New Song 'Say Peace' With Black Thought, PJ*, Rolling Stone Australia (Oct. 29, 2020), available at https://au.rollingstone.com/music/music-news/common-black-thought-pj-new-song-say-peace-18666/ [https://perma.cc/MJY7-HBV6].  It would be an overgeneralization to leave the impression that rap music/lyrics focus exclusively on violence.

defendant. I would decide this case otherwise. I would hold that the circuit court abused its discretion in admitting into evidence rap lyrics that Montague composed. In my view, the rap lyrics were inadmissible.

Although the Majority appears to acknowledge that reversal of a trial court's decision for abuse of discretion requires that "[t]he decision under consideration has to be well removed from any center mark imagined by a reviewing court and beyond the fringe of what the court deems minimally acceptable[,]" Arrington v. State, 411 Md. 524, 552, 983 A.2d 1071, 1087 (2009) (cleaned up), see Maj. Slip Op. at 35, the Majority gives short shrift to the concept. It is difficult to imagine a more compelling case for abuse of discretion than a decision to admit evidence at trial that does little more than portray a defendant to be a person with base violent tendencies who is capable of indiscriminate violent criminal acts. That is what occurred in this case. The rap lyrics that were admitted into evidence bore no "close nexus" (factual or temporal) to the crimes with which Montague was charged—indeed, it is unclear when the lyrics were even written—and did nothing more than create the impression that Montague was a person with a penchant for violence who was capable of murder. Thus, even under the broad standard established by the majority opinion, the rap lyrics were inadmissible.

Here, the Majority concludes that the rap lyrics were admissible because:

> The rap lyrics bear a close factual and temporal nexus to the details of [George] Forrester's murder, and that nexus is strengthened by [] Montague's use of "snitch" references to potentially intimidate witnesses. As a result of this close nexus, we also hold that the trial [court] did not abuse [its] discretion in admitting the rap lyrics under [Maryland] Rule 5-403.

Maj. Slip Op. at 2-3. In other words, where rap lyrics are concerned, the Majority deems the existence of a close factual and temporal nexus to the details of an alleged crime and references to witness intimidation to be evidence of strong probative value sufficient to overcome the danger of unfair prejudice under Maryland Rule 5-403. Although the Majority seemingly concedes that a case-by-case analysis is necessary, this is the standard that the Majority adopts.

The standard conflicts with holdings of other courts that have concluded that, "absent a strong nexus between specific details of the artistic composition and the circumstances of the offense," the "prejudicial effect overwhelms any probative value" where rap lyrics are offered to demonstrate that a defendant had "a propensity toward committing, or at the very least glorifying, violence and death." State v. Skinner, 95 A.3d 236, 251-52 (N.J. 2014). Indeed, in Skinner, id. at 252, a case cited by the Majority, to avoid the danger of unfair prejudice to the defendant, the Supreme Court of New Jersey required that rap lyrics have an "unmistakable factual connection" to the details of the charged offense. Similarly, the Supreme Court of South Carolina has held that rap lyrics containing only "general references glorifying violence" were inadmissible. State v. Cheeseboro, 552 S.E.2d 300, 313 (S.C. 2011).

Likewise, in affirming a judgment of conviction in a case involving the introduction of a video containing rap lyrics against a defendant at trial, the Supreme Court of Kentucky required that "the video refer[] to [the defendant's] actions and emotions regarding this crime, not a previous offense, [] the video shed[] light on [the defendant's] . . . mental state shortly after the killing, and [] the video establish[] premeditation and motive in [the

- 3 -

defendant's] own words." Greene v. Commonwealth, 197 S.W.3d 76, 87 (Ky. 2006). And, the Supreme Court of Nevada affirmed the admission of rap lyrics where the lyrics "tended to prove [the defendant's] involvement in the charged robbery" because they "included details that matched the crime charged." Holmes v. State, 306 P.3d 415, 418-19 (Nev. 2013).

Here, in the end, after reviewing relevant case law to determine the admissibility of rap lyrics, the Majority simply concludes that "[r]ap lyrics that have a factual and temporal nexus to the details of an alleged crime are *more* probative of a defendant's guilt when those same lyrics contain 'stop snitching' references that are published to threaten witnesses to the crime." Maj. Slip Op. at 29 (emphasis in original). In other words, the Majority merely determines that factors to consider when determining whether a nexus exists between defendant-authored rap lyrics and an alleged crime include a close factual relationship, a close temporal relationship and whether the lyrics include "stop snitching" references that are allegedly published to threaten potential witnesses. In none of the above cases did a State Supreme Court simply conclude that evidence having a close factual and temporal nexus to a charged crime along with references to violence against snitches constitutes evidence of sufficient probative value to outweigh the danger of unfair prejudice.

Indeed, in Hannah, 420 Md. at 348, 23 A.3d at 197, this Court observed: "Most appellate courts that have reviewed rulings admitting words written by [a] defendant have distinguished admissible statements of historical fact from inadmissible works of fiction." (Footnote omitted). In this case, a review of the rap lyrics at issue reveals that the lyrics

do not have a close factual nexus to the crimes charged, let alone an unmistakable factual connection, and are nothing more than lyrics attendant to generic rap music. It is undisputed that during a recorded telephonic conversation while he was incarcerated, Montague stated the following rap lyrics:

> Listen, I said YSK, I ain't never scared. I always let it spray. And if a n[****] ever play, treat his head like a target. You know he's dead today, I'm on his a[**] like a Navy Seal. Man, my n[****]s we ain't never squeal. I'll pop your top like an orange peel. You know I'm from the streets, F.T.G.,[2] you know the gutter in me and I be always reppin' my YSK s[***] because I'm a king. I be playing the block b[****], and if you ever play with me, I'll give you a dream, a couple shots snitch. It's like a hockey pucks the way I dish out this. It's a .40 when that b[****] going to hit up s[***]. Four or five, rip up your body quick like a pick up truck, but you ain't getting picked up. You getting picked up by the ambulance. You going to be dead on the spot. I'll be on your a[**].

The first few lines of the rap lyrics had no nexus to this case whatsoever, and instead were simply references to violence such as "pop[ping] your top[,]" "let[ting] it spray[,]" and "treat[ing] his head like a target." These lines were disconnected from this case as the victim was shot only in the torso, not in the head. The first few lines of the rap lyrics lacked any probative value and carried a high risk of unfair prejudice due to the violent and depraved nature of the acts that they described.

Specifically, insofar as the language "if a n[****] ever play, treat his head like a target. You know he's dead today" is concerned, the language could apply to any dispute, disagreement, or grievance between people. The Majority interprets this language to mean that Montague was rapping about being provided counterfeit money by Forrester. See Maj.

---

[2]The State did not offer any evidence of what "YSK" or "FTG" stood for.

Slip Op. at 32. There is nothing whatsoever about this language that is related to the receipt of counterfeit money. Any type of shooting or violent act is usually the result of a disagreement between the parties. The language in Montague's rap lyrics could easily refer to a dispute about a girlfriend, a parking space, or any perceived slight. It is pure fiction to interpret this generic language as referring to the receipt of counterfeit money, and the language does not bear a close nexus to the crimes that were charged in this case. This language is analogous to that in Cheeseboro, 552 S.E.2d at 312, in which the defendant rapped, in pertinent part: "Victimize me and Jermain Dupri, don't let me see or else there'll be death in this industry." Like Montague, the defendant in Cheeseboro referred to killing someone in reprisal, but did not specify any act other than "Victimize me," similar to the words Montague used "if a n[****] ever play," that would provoke such retaliation. I agree with the Supreme Court of South Carolina that such vague language has only minimal probative value, and a substantial danger of unfair prejudice, because the language does nothing more than glorify violence, without referring to the particular circumstances of the crime at issue. See id. at 313.

Other lines in the rap lyrics had only slight probative value because each portion of the rap lyrics that was purportedly connected to the case was a reference to something that was so common that the alleged nexus was tenuous at best. For example, the rap lyrics referred to "a .40[.]" .40 is "a common caliber of ammunition used in handguns[.]" Ponce v. People, No. 2015-0067, 2020 V.I. 2, 2020 WL 1551324, at *16 (V.I. Apr. 1, 2020) (Swan, J., concurring in part and dissenting in part). Thus, the circumstance that two .40 caliber shell casings were found at the crime scene added little to the probative value of the

rap lyrics. Nor did the reference in the rap lyrics to an ambulance have any probative value, given that it is common sense to expect an ambulance to show up at the scene of a shooting.[3]

Finally, the line of the rap lyrics that went: "[I]f you ever play with me, I'll give you a dream, a couple shots snitch" had no probative value. The State did not offer any evidence that the victim was a "snitch"—*i.e.*, that the victim had ever been a confidential informant, had ever reported Montague to law enforcement officers, and/or had ever provided the State with any evidence against him. To the extent that the Majority concludes that the reference to a snitch involves a threat or specific source of intimidation against a specific witness in the case, namely Tracy Tasker, nothing in the lyrics referenced Tasker or any circumstance related to Montague's alleged encounter with Tasker while detained. It is pure speculation that "the phrase I be playing the block b[****], and if you ever play with me, I'll give you a dream, a couple shots snitch" has anything to do with any witness in the case, let alone Tasker.

Indeed, although the Majority considers the inclusion of "stop snitching" references in rap lyrics "that are published to threaten witnesses to the crime" as increasing the probative value of the lyrics, Maj. Slip Op. at 29, in actuality, the reference to violence against snitches increases the danger of unfair prejudice. Foremost, here, there is no connection in the lyrics between the "snitch" and any person or circumstance related to the

---

[3]Similarly, the reference in the rap lyrics to a pickup truck had no probative value. The State acknowledges that, "[a]lthough [the victim]'s vehicle was consistently referred to as a 'truck' throughout the trial," it was actually a Ford Explorer, which is not a truck, whether pickup or otherwise.

case, and there was no factual finding by the circuit court that the lyrics were published to threaten a witness in the case.[4]  As the United States Court of Appeals for the Seventh Circuit in United States v. Thomas, 86 F.3d 647, 654 (7th Cir. 1996) observed, threats against witnesses "constitute a striking example of evidence that appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case."  (Cleaned up).  Indisputably, evidence concerning threats to a witness or potential witness is highly prejudicial because such evidence injects considerations separate from those of whether the defendant committed the crime charged, such as concerns that the defendant may have obstructed justice, engaged in witness tampering, or may be a source of violence to others.

Here, in addition to the content of the rap lyrics not matching any of the specific details of the offense and containing a highly prejudicial "stop snitching" reference, the rap lyrics did not have any additional probative value by virtue of the reaction of the individual

---

[4]In ruling on the motion *in limine* to exclude evidence of the jail call, the circuit court stated:

> I'm denying Defense Motion to Suppress . . . . You can always argue the probative value either way.  I think they're relevant and I don't think they're a discovery violation. . . . . Your argument was more probative value and I think that it can be argued either way as to what weight the jury wants to give those[.]

Likewise, in overruling Montague's objection at trial and in denying the motion for a new trial, the circuit court did not find that the rap lyrics were published on social media to intimidate a witness in the case.  If anything, the circuit court's ruling on the motion *in limine* demonstrates that the circuit court did not explicitly address the danger of unfair prejudice concerning the admission of the rap lyrics.

with whom Montague was speaking. By telling Montague to "[s]top rap[p]ing like that[,]" the individual certainly indicated that he believed that the rap lyrics would make Montague look bad. That does not necessarily mean, however, that either Montague or the individual considered the rap lyrics to be an admission of guilt as to the victim's murder.

As to temporal proximity, there is no evidence of when Montague composed the rap lyrics. What can be gleaned from the majority opinion is that, while detained awaiting trial, Montague said the lyrics to a friend to be recorded. See Maj. Slip Op. at 2, 6-7. There has been no admission attributed to Montague that he composed the lyrics for the first time shortly after the charged offense or even while detained awaiting trial, and there is no such evidence from any other witness. For all the majority opinion reveals, Montague may have been working on the lyrics long before being charged with the offense in this case.

In Hannah, 420 Md. at 355, 23 A.3d at 201, this Court explained that the rap lyrics in the case "were probative of no issue other than the issue of whether [the defendant] ha[d] a propensity for violence." We stated that the rap lyrics "had no tendency to prove any issue other than the issue of whether [the defendant] was a violent thug with a propensity to commit the crimes for which he was on trial." Id. at 357, 23 A.3d at 202. The same can be said of the rap lyrics at issue in this case.[5] This case is analogous to Hannah because,

---

[5]In this case, the manner in which the rap lyrics were used at trial increased the danger of unfair prejudice. During trial, the recording of the rap lyrics was played for the jury. Over Montague's counsel's objection, the circuit court admitted the recording into evidence. Near the end of the State's initial closing argument, the prosecutor called the rap lyrics a "narration of [the victim]'s homicide[.]" The prosecutor once again played the recording of the rap lyrics for the jury, and contended that they constituted the first time that Montague had spoken "substantively about his case." The prosecutor noted that the

- 9 -

in each case, the rap lyrics had only a tenuous nexus to the case's circumstances, and, thus, the danger of unfair prejudice substantially outweighed any probative value that the rap lyrics had. In Hannah, id. at 341, 345, 23 A.3d at 193, 195, the facts of the case involved the person responsible for the murder allegedly lowering his vehicle's driver's window and shooting at the victim. One of the rap lyrics was: "Ya see da tinted cum down n out come da glock**." The person responsible for the murder or an accomplice allegedly shot at the victim from inside a vehicle. Two of the rap lyrics were: "I ain't got guns, got a duz unda da seat"; and: "Wa you think, I ain't got burners, got a duz unda da seat." Id. at 341, 345, 23 A.3d at 193, 195. Three shots were fired at the victim three times, and two lines of the rap lyrics were the same: "One, two three, shot ya a[**] just got drop." Id. at 341, 345-46, 23 A.3d at 193, 195-96. Despite these parallels between the rap lyrics and the circumstances of the crime, this Court concluded that cross-examining the defendant about the rap lyrics was unfairly prejudicial. See id. at 357, 23 A.3d at 202.

Similarly, here, although there may arguably be some parallels between the shooting and Montague's rap lyrics, however attenuated, the rap lyrics and this case's circumstances do not share a close factual (or, indeed, temporal) nexus and the lyrics have minimal probative value. The minimal probative value was substantially outweighed by the risk

---

individual to whom Montague was speaking told him to stop rapping. The prosecutor asserted: "It's so obvious and apparent that he's talking about the homicide of [the victim] that there's no need to address it any further."

In sum, the circuit court allowed the jury to hear all of the rap lyrics multiple times, which, from my perspective, compounded the danger of unfair prejudice. Particularly in light of the prosecutor's replaying of, and emphasis on, the rap lyrics near the end of the State's initial closing argument, the rap lyrics carried a significant danger of unfair prejudice.

that the rap lyrics would simply make the jury believe that Montague was a violent person "with a propensity to commit the crimes for which he was on trial[,]" id. at 357, 23 A.3d at 202, *i.e.*, the minimal probative value was substantially outweighed by the danger of unfair prejudice.

Notably, in Hannah, id. at 357, 23 A.3d at 202, this Court did not hold that the rap lyrics were inadmissible because the State offered them for impeachment evidence. To the contrary, this Court unequivocally held that the rap lyrics were "unfairly prejudicial" because they tended to prove only that the defendant was a violent person who was predisposed to commit the crimes for which he was on trial. Id. at 357, 23 A.3d at 202. In other words, this Court's opinion in Hannah, id. at 357, 23 A.3d at 202, demonstrates that the rap lyrics at issue were inadmissible, not because of the purpose for which the State offered them, but instead because they were inflammatory and lacked probative value. Likewise, from my perspective, Montague's rap lyrics were inadmissible because the danger of unfair prejudice substantially outweighed their probative value. The rap lyrics had little to no probative value and any limited probative value of the lyrics is derived by construing the wording of the lyrics in a manner to be allegedly consistent with the offense when the lyrics clearly do not match the details of the offense. With this case, the Majority has established a broad standard that will essentially permit rap lyrics containing generic references to violence to be admitted into evidence despite the danger of unfair prejudice substantially outweighing any minimal probative value of the evidence.

For the above reasons, respectfully, I dissent.