*Kenyatta M. Smith v. State of Maryland*, No. 26, September Term, 2021.  Opinion by Getty, C.J.

**PETITION FOR WRIT OF ERROR *CORAM NOBIS* — QUALIFICATIONS FOR RELIEF — DISCRETION OF THE *CORAM NOBIS* COURT**

The Court of Appeals held that a circuit court did not abuse its discretion in denying a petition for writ of error *coram nobis* where the petitioner satisfied the qualifications set forth in *Skok v. State*, 361 Md. 52 (2000), but did not establish that the matter presented circumstances compelling the extraordinary remedy of a writ of error *coram nobis* to achieve justice.

Circuit Court for Baltimore County
Case No. 03-K-02-002951
Argued: January 11, 2022

IN THE COURT OF APPEALS

OF MARYLAND

No. 26

September Term, 2021

KENYATTA M. SMITH

v.

STATE OF MARYLAND

*Getty, C.J.
*McDonald,
Watts,
Hotten,
Booth,
Biran,
Gould,

JJ.

Opinion by Getty, C.J.

Filed: August 15, 2022

*Getty, C.J., and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court; after being recalled pursuant to Maryland Constitution, Article IV, Section 3A, they also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The case before us involves a petition for the extraordinary remedy of a writ of error *coram nobis*, which overturns a person's prior criminal convictions. Petitioner Kenyatta M. Smith ("Ms. Smith") has twenty-year old convictions for forgery and fraud/identity theft. Due to these felony convictions, Ms. Smith is not eligible to receive the license required to work as a mortgage loan originator under Maryland law. As such, Ms. Smith petitioned the Circuit Court of Baltimore County for a writ of error *coram nobis*, which the circuit court ultimately denied. The circumstances of that denial led to the present appeal. Accordingly, this Court is asked to resolve whether the circuit court abused its discretion in denying Ms. Smith's petition for writ of error *coram nobis*. For the reasons explained in detail below, considering the legislative purpose of the Maryland mortgage loan originator licensing statute and the fact that granting Ms. Smith's petition for writ of error *coram nobis* would effectively circumvent a federal mandate on mortgage loan originator licensing requirements, we answer that question in the negative and affirm the judgment of the Court of Special Appeals.

## BACKGROUND

### A.     *The Underlying Convictions*

On June 3, 2002, the District Court for Baltimore County convicted Ms. Smith of one count of forgery and two counts of fraud/identity theft. Ms. Smith subsequently appealed her convictions to the Circuit Court for Baltimore County, where she then entered a guilty plea to all counts.

The underlying circumstances that led to these convictions involved Ms. Smith using, without authorization, her former employer's personal identifying information,

including the employer's name, tax identification number, and social security number, to obtain a commercial loan for $40,000.00. Ms. Smith then used checks bearing her former employer's forged signature to deposit the fraudulently obtained loan into her personal bank account. Ms. Smith purchased a Lexus automobile from a Lexus dealership in Reisterstown, Maryland with the fraudulently obtained money.

The circuit court sentenced Ms. Smith to three years of incarceration, all suspended. The circuit court did not require Ms. Smith to pay restitution because after her convictions of forgery and fraud/identity theft, Ms. Smith sold the automobile, used the proceeds of the sale to pay back the loan, converted the loan to her name and then continued making payments on the outstanding balance.

## B.    *Petition for Writ of Error* Coram Nobis

On May 21, 2015, over a decade after her convictions, counsel for Ms. Smith filed a petition for writ of error *coram nobis* ("Petition") with the Circuit Court for Baltimore County, requesting that the circuit court vacate the forgery and fraud/identity theft convictions. The Petition argued that Ms. Smith's entry of a guilty plea should be invalidated because neither the circuit court nor Ms. Smith's counsel advised her of the following:

> (1) the offenses to which she was pleading guilty; (2) the elements of the crime to which she was pleading guilty; (3) the presumption of innocence; (4) her forfeit of preliminary motions to contest the charging document, arrest, any confession or statement, results of searches and seizures, pretrial or in-court identifications, or other technical defenses; (5) or of the immigration or other collateral consequences of entering a plea of guilt.

Accordingly, counsel for Ms. Smith argued that the "plea was involuntary[.]"

2

Additionally, the Petition asserted that Ms. Smith faces significant collateral consequences as a result of these convictions. Specifically, Ms. Smith is disqualified from obtaining a mortgage loan originator's license pursuant to Maryland Code (1980, 2020 Repl. Vol., 2021 Supp.) Financial Institutions Article ("FI") § 11-605,[1] and Ms. Smith lost "the opportunity for employment in her field on at least five separate occasions[.]" Counsel for Ms. Smith attached two exhibits to the Petition—the transcript from Ms. Smith's hearing before the circuit court on September 20, 2002, and a letter from the Department of Labor, Licensing, and Regulation ("DLLR") denying Ms. Smith's application for a mortgage loan originator's license dated January 26, 2007. The hearing transcript from the guilty plea hearing reflects that neither the circuit court nor Ms. Smith's counsel advised her of the nature and elements of the offenses to which she pleaded guilty. The letter from DLLR specifically cited Ms. Smith's felony conviction for "forgery[—]private

---

[1] In pertinent part, FI § 11-605 provides:

> (a) The Commissioner may not issue a mortgage loan originator license unless the Commissioner makes, at a minimum, the following findings:
>
> *     *     *
>
> (2) The applicant has not been convicted of, or pled guilty or nolo contendere to, a felony in a domestic, foreign, or military court:
>
>> (i) During the 7-year period immediately preceding the date of the application for licensing; or
>>
>> (ii) At any time preceding the date of application, if the felony involved an act of fraud, dishonesty, a breach of trust, or money laundering;

3

documents" as "negatively relat[ing] to [her] fitness and qualification to act as a mortgage originator."

## C. *The Circuit Court's Initial Denial of the Petition for Writ of Error* Coram Nobis

The Circuit Court for Baltimore County issued a memorandum opinion and order on August 18, 2015 denying Ms. Smith's Petition without a hearing. In its analysis, the circuit court relied on *State v. Hicks*, which articulated that the following five conditions must be satisfied for *coram nobis* relief to be granted:

> (1) [T]he grounds for challenging the criminal conviction must be of a constitutional, jurisdictional or fundamental character.
>
> (2) [A] presumption of regularity attaches to the criminal case, and the burden of proof is on the coram nobis petitioner.
>
> (3) [T]he coram nobis petitioner must be suffering or facing significant collateral consequences from the conviction.
>
> (4) Basic principles of waiver are applicable to issues raised in coram nobis proceedings.
>
> (5) [O]ne is not entitled to challenge a criminal conviction by a coram nobis proceeding if another statutory or common law remedy is then available.

139 Md. App. 1, 10 (2001) (citing *Skok v. State*, 361 Md. 52, 78–80 (2000)).

The circuit court acknowledged that Ms. Smith was "not advised of the nature and elements of the crimes to which she was pleading guilty[,]" and that Ms. Smith had exhausted all other potential legal remedies. However, the circuit court disagreed that Ms. Smith had suffered "significant collateral consequences" as a result of these convictions. The circuit court stated that Ms. Smith "is simply unable to work in the industry of her choosing. The financial industry has vested and obvious reasons for refusing to hire

4

individuals with convictions for fraud and forgery. It is, therefore, not unjust that she cannot work in that industry because of the convictions." The circuit court also determined that Ms. Smith waived her right to *coram nobis* relief "because she did not appeal her conviction when it occurred in 2002."

**D.      *Appeal to the Court of Special Appeals & the Circuit Court's Remand Hearing***

Ms. Smith timely appealed the circuit court's denial of her Petition to the Court of Special Appeals. On August 1, 2016, the intermediate appellate court vacated the judgment of the circuit court in an unreported opinion and remanded the case for the circuit court to hold a hearing on the Petition. *See Smith v. State*, No. 1605, slip op. at 1 (Md. Ct. Spec. App. Aug. 1, 2016). The Court of Special Appeals concluded that "the circuit court was wrong to deny [Ms. Smith's Petition] without a hearing," and therefore vacated the judgment and remanded the matter to the circuit court. *Id.* Judge Daniel A. Friedman authored a concurring opinion, maintaining "that the test for 'significant collateral consequences' is not supposed to be quite so high a bar as the trial court originally set it[.]" *Smith v. State*, No. 1605, slip op. at 2 (Md. Ct. Spec. App. Aug. 1, 2016) (Friedman, J., concurring). The concurring opinion set forth that "economic harm, even without more, can satisfy the 'significant collateral consequences' element of the test for issuance of the writ of coram nobis." *Id.* at 3.

The remand hearing took place in the circuit court on February 17, 2017. At the beginning of the hearing, counsel for Ms. Smith stated, "[a]nd in speaking with the State, we're both of the opinion we're sort of back only on the collateral consequences prong if you will[.]" The State agreed and responded that it would not be introducing any evidence

at the hearing.  Ms. Smith's counsel reiterated that Ms. Smith's convictions prevent her from working in the mortgage loan origination industry, and proffered that her convictions have: (1) prevented her from obtaining jobs from at least four private sector firms; (2) prevented her from obtaining work with a salary comparable to what she would be earning as a mortgage loan originator; (3) led numerous recruiters to conclude that a background check would preclude her from particular job opportunities; and (4) resulted in potential educational funding being cut off.  Additionally, Ms. Smith's counsel highlighted that these hardships are exacerbated by the fact that Ms. Smith is a single mother with a liver condition, which limits her mobility.

On September 18, 2017, the circuit court issued a memorandum opinion, denying Ms. Smith's Petition on the grounds that Ms. Smith had not established significant collateral consequences.  The circuit court explained that prohibiting an individual with underlying forgery and fraud/identity theft convictions from obtaining employment in a profession that strongly values honesty and integrity, such as the mortgage loan origination field, is not an uncommon occurrence.  Accordingly, the circuit court found that Ms. Smith's employment difficulties were "incommensurate with the extraordinary and compelling circumstances that warrant" granting a petition for writ of error *coram nobis*.

### E.    *Second Appeal to the Court of Special Appeals*

Ms. Smith again noted a timely appeal to the Court of Special Appeals, which reversed the decision of the circuit court in an unreported opinion.  *See Smith v. State*, No. 1721, slip op. at 1 (Md. Ct. Spec. App. May 20, 2019).  The intermediate appellate court concluded that "the circuit court failed to properly evaluate the significant collateral

6

consequences element of coram nobis[.]" *Id*. Additionally, the Court of Special Appeals held, as a matter of law, that Ms. Smith's inability to become a licensed mortgage loan originator "demonstrated that she is suffering a significant collateral consequence." *Id*. Therefore, the intermediate appellate court remanded the matter to the circuit court to determine if Ms. Smith's Petition "presents 'circumstances compelling relief to achieve justice.'" *Id*. The intermediate appellate court instructed the circuit court to consider on remand whether its "error concerning the significant collateral consequences element of the coram nobis test may have influenced its determination as to whether there were 'compelling circumstances' necessary to 'achieve justice[.]'" *Id*. at 5.

Judge Friedman authored another concurring opinion "because . . . the per curiam majority [did] not go far enough to dispel the circuit court's erroneous conclusion that economic consequences are not significant collateral consequences on their own." *Smith v. State*, No. 1721, slip op. at 1 (Md. Ct. Spec. App. May 20, 2019) (Friedman, J., concurring). The concurring opinion emphasized that "economic consequences are alone sufficient to establish significant collateral consequences for coram nobis." *Id*. at 7.

### F.     *Further Proceedings in the Circuit Court*

The Court of Special Appeals issued the mandate for its decision on June 20, 2019, which the circuit court received on September 12, 2019. In response to the mandate, the State filed "State's Answer to Petition for Post Conviction Relief" in the circuit court on October 2, 2019. The State argued that the present circumstances "do not necessitate *coram nobis* relief in order to achieve justice." Specifically, the State relied on the clear

"nature of the offenses[,]" "the statement of the facts, common understanding of the offenses, and the age of [Ms. Smith,]" to demonstrate the lack of such circumstances.

Without receiving a response from Ms. Smith,[2] the circuit court issued a memorandum opinion on January 28, 2020, again denying Ms. Smith's Petition. The circuit court concluded that Ms. Smith satisfied all "of the substantive elements that would afford someone the opportunity to be granted [*coram nobis* relief]." Beyond the substantive elements, the circuit court explained that Ms. Smith also needed to "convince the [circuit court] that there are compelling circumstances necessary to achieve justice." (Footnote omitted). The circuit court was "not persuaded . . . that there are compelling circumstances necessary to achieve justice."

Further, the circuit court reasoned that "Maryland does not allow those who were convicted of or pled guilty to a felony involving an act of fraud, dishonesty, breach of trust, or money laundering to obtain a mortgage [loan] originator's license." (citing FI § 11-605(a)(2)(ii)). Summarizing the legislative history of FI § 11-605, the circuit court concluded that the legislative purpose for the statute outweighed the purpose of *coram nobis* relief and any argument in favor of granting Ms. Smith's Petition. The circuit court set forth that

> [a] review of the legislative history clearly indicates that the Maryland General Assembly in enacting this legislation intended to combat the problems arising from the dishonesty amongst individuals employed in the mortgage origination field and by necessity given access to the private

---

[2] Ms. Smith noted in her opening brief to this Court that the certificate of service on the State's Answer to Petition for Post Conviction Relief listed Ms. Smith's home address instead of the address of Ms. Smith's counsel that represented her in the prior *coram nobis* proceedings.

8

financial information of individual members of the general public be of good moral character, free from issues of dishonesty and lack of trustworthiness.

Accordingly, the circuit court denied Ms. Smith's Petition.[3]

## G.    *Third Appeal to the Court of Special Appeals*

Ms. Smith noted a third timely appeal to the Court of Special Appeals, challenging the circuit court's denial of her Petition. The intermediate appellate court issued an unreported opinion on April 20, 2021, affirming the circuit court's denial of Ms. Smith's Petition. *See Smith v. State*, No. 2534, slip op. at 1 (Md. Ct. Spec. App. Apr. 20, 2021). The Court of Special Appeals stated that it reviews "the circuit court's ultimate decision to deny Ms. Smith relief under the abuse of discretion standard, with legal determinations reviewed without deference and factual findings left undisturbed unless clearly erroneous." *Id*. at 4 (citing *State v. Rich*, 454 Md. 448, 470–71 (2017)). The intermediate appellate court concluded that "[a]lthough we might have granted Ms. Smith the relief she sought, we certainly cannot say that the circuit court's decision to deny the writ was so far removed from any center mark as to constitute an abuse of discretion." *Id*. at 4–5.

Judge Friedman authored a third concurring opinion, stating "I do not think the circuit court abused its discretion in denying the petition for a writ of error coram nobis. I write separately because I cannot imagine a more deserving petitioner than Kenyatta

---

[3] On January 30, 2020, two days following the issuance of the circuit court's memorandum opinion and order, an attorney in the Office of the Public Defender's Post-Conviction Defenders Division filed a notice of appearance in the circuit court. The same attorney filed a Motion to Reconsider Denial of Petition for Writ of Error Coram Nobis on February 12, 2020. Ms. Smith noted her third timely appeal to the Court of Special Appeals on February 25, 2020. To date, the circuit court has not ruled on this motion.

Smith." *Smith v. State*, No. 2534, slip op. at 1 (Md. Ct. Spec. App. Apr. 20, 2021) (Friedman, J., concurring). Judge Friedman further articulated that "[t]he collateral consequence is . . . always a respect-worthy legislative policy judgment" and the legislative purpose of FI § 11-605 "ought not be the sole reason to deny relief." *Id*. at 3.

## H. *Petition for Writ of* Certiorari

Ms. Smith petitioned this Court for a writ of *certiorari*, which we granted on August 25, 2021. *Smith v. State*, 475 Md. 700 (2021). Ms. Smith posed the following questions:

> 1. When a petitioner satisfies the substantive requirements for receiving coram nobis relief—i.e., they have exhausted all other available remedies, have proven that the convictions they are challenging suffer from constitutional or other fundamental error, and have established that the challenged convictions create a significant collateral consequence—to what extent does the petitioner still need to show that there are "compelling circumstances" warranting relief?
>
> 2. Where Petitioner met the established prerequisites for obtaining coram nobis relief, did the circuit court err in ruling that, under dicta in *Coleman v. State*, 219 Md. App. 339 (2014), there are not "compelling circumstances" to vacate Petitioner's convictions because, *inter alia*, the legislative purpose behind the creation of Petitioner's significant collateral consequence (i.e., her inability to obtain a license as a mortgage originator) takes precedence?

We consolidate and restate the questions as to whether the circuit court abused its discretion in denying Ms. Smith's Petition. For the reasons discussed in detail below, we answer that question in the negative. We hold that the circuit court did not abuse its discretion in denying Ms. Smith's Petition, and therefore affirm the judgment of the Court of Special Appeals.

10

**STANDARD OF REVIEW**

This Court reviews a circuit court's decision to grant or deny a petition for writ of error *coram nobis* for abuse of discretion. *See Rich*, 454 Md. at 470–71. "However, in determining whether the ultimate disposition of the *coram nobis* court constitutes an abuse of discretion, [this Court] should not disturb the *coram nobis* court's factual findings unless they are clearly erroneous[.]" *Id*. at 471. An abuse of discretion "occurs where no reasonable person would take the view adopted by the circuit court." *Mainor v. State*, 475 Md. 487, 499 (2021) (quoting *Montague v. State*, 471 Md. 657, 674 (2020)) (internal quotation marks omitted).

**DISCUSSION**

**A.** ***Writ of Error* Coram Nobis**

A writ of error *coram nobis* is an extraordinary remedy, rooted in English common law, which is available to correct errors of fact that affect the validity or regularity of a judgment and to correct constitutional or fundamental legal errors. *See United States v. Morgan*, 346 U.S. 502, 507–12 (1954). In 2000, this Court adopted the United States Supreme Court precedent decided in *Morgan*, which is "[t]he leading American case concerning the nature and scope of a coram nobis proceeding[,]" *Skok*, 361 Md. at 71, that clearly established that a writ of error *coram nobis* should be utilized "only under circumstances compelling such action to achieve justice." *Id.* at 72 (quoting *Morgan*, 346 U.S. at 511) (internal quotation marks omitted). We consistently emphasize the extraordinary nature of this remedy in analyzing matters involving a writ of error *coram*

11

*nobis*. *See Rich*, 454 Md. at 461, 470–71; *State v. Smith*, 443 Md. 572, 597 (2015) (quoting *Skok*, 361 Md. at 72).

In *Skok*, this Court set forth five "qualifications" that a petitioner challenging a criminal conviction must establish in a petition for writ of error *coram nobis*, namely—(1) "the grounds for challenging the criminal conviction must be of a constitutional, jurisdictional, or fundamental character[;]" (2) "the burden of proof is on the . . . petitioner[;]" (3) the petitioner "must be suffering or facing significant collateral consequences from the conviction[;]" (4) "[b]asic principles of waiver are applicable to issues raised in [*coram nobis*] proceedings[;]" and (5) "one is not entitled to challenge a criminal conviction by a [*coram nobis*] proceeding if another statutory or common law remedy is then available." 361 Md. at 78–80.

Five years after our decision in *Skok*, the Court adopted procedural rules governing *coram nobis* proceedings, which took effect on January 1, 2006. *See* Md. Rule 15-1201, *et seq*. Maryland Rule 15-1202(a) establishes that "[a]n action for a writ of error *coram nobis* is commenced by the filing of a petition in the court where the conviction took place." Subsection (b) sets forth the pleading requirements for the petition for writ of error *coram nobis*, which encompasses the five qualifications this Court articulated in *Skok*. Maryland Rule 15-1202(b) states, in pertinent part, that the petition shall include:

> (D) the facts that would have resulted in the entry of a different judgment and the allegations of error upon which the petition is based;
>
> (E) a statement that the allegations of error have not been waived;
>
> (F) the significant collateral consequences that resulted from the challenged conviction; [and]

12

(G) the unavailability of appeal, post conviction relief, or other remedies[.]

Md. Rule 15-202(b)(1)(D)–(G).

Maryland Rule 15-1206(a) sets forth that it is within the *coram nobis* court's discretion to hold a hearing on the petition for writ of error *coram nobis*. The *coram nobis* court is permitted to deny the petition without holding a hearing but, notably, may only grant the petition if a hearing is held. Md. Rule 15-1206(a). Additionally, at the hearing, it is within the *coram nobis* court's discretion to "permit evidence to be presented by affidavit, deposition, oral testimony, or any other manner that the court finds convenient and just." *Id*.

The *coram nobis* court is required to "prepare and file or dictate into the record a statement setting forth separately each ground on which the petition is based, the federal and state rights involved, the court's ruling with respect to each ground, and the reasons for the ruling." Md. Rule 15-1207(a). Further, "[t]he statement shall include or be accompanied by an order granting or denying relief." Md. Rule 15-1207(b). If the *coram nobis* court grants the petition for writ of error *coram nobis*, "the court may provide for rearraignment, retrial, custody, bail, discharge, correction of sentence, or other matters that may be necessary and proper." *Id*.

This Court's precedent regarding the extraordinary nature of a writ of error *coram nobis* in connection with the governing Maryland Rules, clearly establishes that the *Skok* qualifications are threshold requirements that a petitioner must satisfy, but satisfaction of these qualifications does not result in an automatic grant of a petition for writ of error

13

*coram nobis*. If these qualifications are not sufficiently established in the petition for writ of error *coram nobis*, the *coram nobis* court is permitted to deny the petition without conducting a hearing on the matter. *See* Md. Rule 15-1206(a). Notably, even where the *Skok* qualifications are established in the petition for writ of error *coram nobis*, the *coram nobis* court still has the discretion to deny the petition without a hearing if the petition does not present the *coram nobis* court with circumstances compelling such action to achieve justice. *Id.*

Accordingly, a petition for writ of error *coram nobis* shall only be granted where the *coram nobis* court conducts a hearing pursuant to Maryland Rule 15-1206(a), determines that the *Skok* qualifications are satisfied, and settles that the matter presents circumstances compelling such action to achieve justice consistent with this Court's precedent. Determining whether the matter involves circumstances compelling such action to achieve justice is not a threshold requirement such as the qualifications enumerated in *Skok*. Instead, this is a discretionary determination left with the *coram nobis* court to ensure that this extraordinary remedy is reserved for only the most egregious and deserving of situations. With this understanding, we turn now to the principal issue before us—whether the circuit court abused its discretion in denying Ms. Smith's Petition.

**B.** **The Circuit Court Did Not Abuse its Discretion in Denying the Petition for Writ of Error Coram Nobis.**

*1.* *Parties' Contentions*

Ms. Smith maintains that the circuit court erred in denying her Petition because she satisfied the *Skok* threshold requirements. Ms. Smith emphasizes that the qualifications

14

this Court enumerated in *Skok* are the "only requirements . . . that must be satisfied in order to receive coram nobis relief." As such, "establishing 'compelling circumstances'[4] is not listed as a separate, sixth requirement." Ms. Smith argues that the circuit court misinterpreted this Court's "use of the phrase 'compelling circumstances' (or a variation of the phrase)" in *Skok*. Further, Ms. Smith explains that satisfaction of the *Skok* requirements demonstrates that a petitioner has also established "compelling circumstances." Accordingly, because Ms. Smith satisfied the "traditional coram nobis requirements[,]" Ms. Smith contends that she "must be granted relief[.]"

In the alternative, Ms. Smith argues that if this Court determines that establishing "compelling circumstances" is an additional requirement to the *Skok* requirements, the circuit court still erred in denying her Petition. Ms. Smith sets forth that her case "does present compelling circumstances" because "the constitutional, fundamental error proved by Ms. Smith is inherently compelling." Additionally, Ms. Smith maintains that "the significant collateral consequence in this case should [not] be treated as any less compelling than other more common consequences." Further, Ms. Smith highlights that "Maryland does not have a definitive list of recognized collateral consequences eligible for coram nobis relief." Therefore, Ms. Smith asserts that "regardless of whether or not this Court concludes that providing 'compelling circumstances' is a separate requirement for receiving coram nobis relief, the circuit court erred in denying the [P]etition."

---

[4] Both Ms. Smith and the State clarified at oral argument before the Court that they utilize the term "compelling circumstances" as shorthand when referring to the *Skok* Court's full language of "circumstances compelling such action to achieve justice."

15

Accordingly, Ms. Smith requests that we reverse the judgment of the Court of Special Appeals.

The State responds that the circuit court properly exercised its discretion in denying Ms. Smith's Petition, as Ms. Smith did not demonstrate that her case presents circumstances compelling such action to achieve justice. The State argues that under this Court's holding in *Skok*, "the circuit court must weigh the existence of compelling circumstances when deciding whether to exercise its discretion to grant a coram nobis petition." As such, the State further asserts that satisfying the *Skok* qualifications is a "threshold requirement to obtain coram nobis relief," however, "nothing in this Court's jurisprudence indicates that doing so automatically entitles a petitioner to relief." The State cites to this Court's holding in *Rich* in support of its contention that the decision to grant a petition for writ of error *coram nobis* is a discretionary determination left with the *coram nobis* court. 454 Md. at 470–71.

The State also argues that the intermediate appellate court properly affirmed the circuit court's denial of Ms. Smith's Petition because the circuit court did not abuse its discretion in reaching its decision. The State maintains that the circuit court properly weighed the legislative purpose of FI § 11-605 in analyzing whether Ms. Smith's Petition presented circumstances compelling such action to achieve justice. The State highlights that the legislative purpose of FI § 11-605 is "to prevent dishonest individuals from working in the mortgage origination field where they would have 'access to the private financial information of individual members of the general public[.]'" Accordingly, overturning Ms. Smith's fraud convictions through a writ of error *coram nobis* would

16

"thwart the legislative purpose of" FI § 11-605 and is an appropriate factor for the circuit court to consider. Therefore, the State requests that this Court affirm the judgment of the Court of Special Appeals.

*2.* *FI § 11-605*

It is undisputed that Ms. Smith's Petition satisfied the *Skok* qualifications necessary for receiving *coram nobis* relief.[5] However, the circuit court found that Ms. Smith did not persuade the court that this matter involves compelling circumstances necessary to achieve justice, and therefore denied Ms. Smith's Petition. The circuit court based its conclusion on the legislative purpose of FI § 11-605, the statutory provision that permanently bars Ms. Smith from obtaining a mortgage loan originator's license due to her underlying criminal convictions. Accordingly, a review of FI § 11-605 and its legislative history is crucial to our analysis of the circuit court's denial of Ms. Smith's Petition.

*i.* *Plain Language of FI § 11-605*

"When engaging in statutory interpretation, this Court's 'chief objective is to ascertain the General Assembly's purpose and intent when it enacted the statute.'" *Lyles v. Santander Consumer USA Inc.*, 478 Md. 588, 601 (2022) (quoting *Berry v. Queen*, 469 Md. 674, 687 (2020)). Therefore, "[w]e assume that the legislature's intent is expressed in

---

[5] The circuit court determined that Ms. Smith's Petition established that the grounds for challenging her criminal convictions were constitutional in nature because she was not advised of the elements of the offenses to which she pleaded guilty or the collateral consequences of the guilty plea. Additionally, the circuit court determined that Ms. Smith's Petition established that she had exhausted all other available statutory and common law remedies. However, it was the intermediate appellate court that determined Ms. Smith's Petition established that she suffers significant collateral consequences from the convictions, which the circuit court ultimately adopted.

17

the statutory language and thus our statutory interpretation focuses primarily on the language of the statute to determine the purpose and intent of the General Assembly." *Berry*, 469 Md. at 687 (quoting *Brown v. State*, 454 Md. 546, 550–51 (2017)).  With these principles, we turn now to the statutory language of FI § 11-605.

FI § 11-605 sets forth the mandatory qualifications for an applicant seeking a mortgage loan originator's license.  Subsection (a) states:

> The Commissioner may not issue a mortgage loan originator license unless the Commissioner makes, at a minimum, the following findings:
>
> *          *          *
>
> (2) The applicant has not been convicted of, or pled guilty or nolo contendere to, a felony in a domestic, foreign, or military court:
>
>> (i) During the 7-year period immediately preceding the date of the application for licensing; or
>>
>> (ii) At any time preceding the date of application, if the felony involved an act of fraud, dishonesty, a breach of trust, or money laundering;

FI § 11-605(a).  Subsection (b) explains that "[a] conviction for which a pardon has been granted is not a conviction for purposes of subsection (a)(2) of this section." FI § 11-605(b).

The plain language of FI § 11-605(a) and (b) establishes that individuals with felony convictions may not qualify for a mortgage loan originator's license unless seven years separate the date of the felony conviction and the date of the application for licensing. Further, an individual with a felony conviction involving "an act of fraud, dishonesty, a breach of trust, or money laundering" is not eligible, and cannot become eligible, to receive

18

a mortgage loan originator's license. However, the statute makes an exception for those convictions that a pardon has been granted. Ms. Smith's convictions for forgery and fraud/identity theft permanently bar her from qualifying for a mortgage loan originator's license because these convictions are felonies involving "an act of fraud, dishonesty, a breach of trust, or money laundering[,]" and she has never been pardoned.

*ii.     The Legislative History of FI § 11-605*

In addition to reviewing the statute's plain language, it is the modern tendency of this Court to continue the analysis of the statute beyond the plain meaning. *Moore v. RealPage Util. Mgmt., Inc.*, 476 Md. 501, 514 (2021) (quoting *In re: S.K.*, 466 Md. 31, 50 (2019)). Here, a review of the legislative history of FI § 11-605 reveals that the prohibition against Ms. Smith qualifying for a mortgage loan originator's license is one that is federally mandated to ensure those working in the mortgage loan industry are vetted for concerns of dishonesty or untrustworthiness and are of good moral character.

The General Assembly enacted FI § 11-605 in 2005, with the passing of House Bill 1040 ("HB 1040"), "[for] the purpose of prohibiting an individual from acting as a mortgage originator on or after a certain date unless the individual is a licensee[.]" 2005 Md. Laws, ch. 590. In its original form, FI § 11-605(a) stated:

> To qualify for a license, an applicant shall satisfy the commissioner that:

> *               *               *

> (2) The applicant is of good moral character and has general fitness to warrant the belief that the applicant will act as a mortgage originator in a lawful, honest, fair, and efficient manner.

*Id.*

19

Prior to 2005, mortgage loan originators could practice in Maryland without receiving a license from the Commissioner of Financial Regulation of DLLR. When misleading and deceptive practices permeated the mortgage loan industry, DLLR requested HB 1040 to require the licensing of mortgage loan officers and justified their request through written testimony to the House Economic Matters Committee that stated:

> At present, the Office of the Commissioner of Financial Regulation is limited in its ability to control the activities of loan officers. It is the mortgage loan officers, not the licensed mortgage broker who deals with a consumer face to face and may participate in fraud, misleading and deceptive practices, real estate flipping and predatory lending practices. Although this Office can initiate action against licensed mortgage lenders or brokers by suspending or revoking their license due to activities of the loan officers, there is no practical way to sanction the loan officer who is participating in these schemes and directly cause financial harm to victims. Often times, the owner of the company may terminate the individual and may or may not notify law enforcement about the alleged crime because of the effect on their company's reputation. The person who may be most culpable because they are dealing directly with the borrower is free to move on, work for another licensed broker, exempt lender or otherwise continue their career in the mortgage lending industry.
>
> A way should be found to protect the public from predatory loan officers as well as from the predatory mortgage lenders and brokers with whom they work. The licensing program contained in HB 1040 should provide that authority.

*See* Written Testimony from the Department of Labor, Licensing and Regulation to the House Economic Matters Committee in legislative bill file for House Bill 1040 (2005).

The President of the Maryland Appraiser's Coalition, Inc., also submitted written testimony in support of HB 1040 to the House Economic Matters Committee, which articulated a similar sentiment:

> Lender coercion of real estate appraisers has become, over the past decade, an insidious virus undermining the integrity of the entire mortgage process.

20

Unscrupulous loan officers - or uninformed or incompetent ones - tell appraisers that they must come up with an opinion of value high enough to support the loan, or they will not be paid (and they certainly will not get more business from that lender). Or, they demand other actions that are clearly unethical, such as changing the description of the property to make it sound more desirable. This perpetrates a fraud on the investor who will ultimately underwrite the loan, believing that the property represents sufficient collateral to protect against loss. Worse, it permits the buyer to be misled into a mortgage that is for more than the property is worth, leaving him or her unable to sell the property without coming up with additional cash - or declaring bankruptcy.

\* \* \*

"Lender pressure", as it is frequently called, was clearly a factor in the flipping scandal in Baltimore.[6] But it is not a home-grown problem. The Federal Financial Institution Regulatory Agencies recently published a notice to banks, S & L's, and credit unions nationwide re-emphasizing their policies prohibiting such practices, and warning that the examiners will be looking for violations. But this still does not apply to mortgage brokers and their often untrained and inexperienced loan officers, many of whom seem to treat mortgage lending as the financial equivalent of the untamed wild west. As President of The Appraisers coalition, my office continues to receive complaints from frustrated appraisers who have been berated by loan officers attempting to dictate the content and value conclusions of the appraisal.

HB 1040 addresses this issue. In its intent to impose order and discipline upon the present laissez-faire attitudes prevalent in the mortgage lending industry, it is consistent with government activities elsewhere in the areas of securities and financial fraud, where both federal and state governments have found it necessary to increase regulatory activities in order to prevent the abuses that are now being prosecuted after the fact.

---

[6] During the late 1990s, Baltimore City experienced a real estate flipping scheme in which real estate speculators purchased homes at depressed prices, made minor cosmetic repairs, and resold the homes quickly at inflated prices. Generally, buyers of these homes "secured mortgages that were more than [the value of] the house, eventually leading to foreclosure." *See* Daniel Taylor, *Making sure appraisals are 'independent' - Pressure: Appraisers say lenders push them to inflate values so that homeowners can maximize their refinancings.*, Balt. Sun, March 7, 2004, at 1L; *see also* John B. O'Donnell, *Judge condemns actions of appraiser Home assessments decried as dishonest in 4 flipping cases License could be rescinded*, Balt. Sun, May 24, 2000, at 1A.

*See* Letter from Beth L. Riedel, President of the Maryland Appraisers' Coalition, Inc., to the House Economic Matters Committee in legislative bill file for House Bill 1040 (2005).

Accordingly, the General Assembly enacted FI § 11-605 to combat the problems arising from the lack of oversight in the mortgage loan industry. FI § 11-605, as originally enacted, established that mortgage loan originators had to "become licensed with the Commissioner of Financial Regulation[,]" and "[t]o qualify for a license, an applicant [had to] satisfy the commissioner that the applicant is of good moral character and has general fitness to warrant the belief that the applicant will act as a mortgage originator in a lawful, honest, fair, and efficient manner." Dep't Legis. Servs., *Fiscal and Policy Note*, House Bill 1040, at 1–2 (2005 Session).

During the 2008 Legislative Session, Senate President Thomas V. Miller, Jr. introduced Senate Bill 270 ("SB 270"), an administration bill[7] supported by Governor Martin O'Malley, with the intention of "expand[ing] the licensing requirements for mortgage lenders and mortgage originators" set forth in FI § 11-605. *See* Dep't Legis. Servs., *Fiscal and Policy Note*, Senate Bill 270, at 1 (2008 Session). A member of the Governor's Legislative Office, the Secretary of Labor, Licensing and Regulation, the Secretary of Housing, and the Commissioner of Financial Regulation collectively

---

[7] An administration bill provides the Governor with "an opportunity to introduce major initiatives[,]" and is an exception to the traditional method of introducing a bill to the General Assembly, which requires sponsorship from a member of the Senate or House of Delegates. *See Blackstone v. Sharma*, 461 Md. 87, 126 n.19 (2018).

submitted written testimony to the Senate Finance Committee in support of SB 270. This testimony explained that

> in response to the unprecedented default and foreclosure rates throughout Maryland as a result of the subprime mortgage crisis, Governor Martin O'Malley established the Homeownership Prevention Task Force last summer. The Task Force was charged with developing an action plan to address escalating foreclosure rates and identify effective ways to preserve homeownership in Maryland . . . Based largely on the work of the Task Force, the O'Malley-Brown Administration [] introduced a package of bills designed to help those families at risk of foreclosure, and create greater protections for future homeowners.

*See* Written Testimony from Lisa L. Jackson, Governor's Legislative Office, Tom Perez, Secretary of Labor, Licensing and Regulation, Ray Skinner, Secretary of Housing and Sarah B. Raskin, Commissioner of Financial Regulation to the Senate Finance Committee in legislative bill file for Senate Bill 270 (2008 Session).

The written testimony further explained that "Senate Bill 270 gives greater authority and oversight to the Commissioner of Financial Regulation to provide better, more effective regulatory oversight over the mortgage industry." *Id*. Specifically, SB 270 prohibited "persons who have been convicted of felony theft, fraud, or forgery within the last ten years from obtaining a mortgage lender or originator license and requires that persons convicted of such felonies while licensed have their licenses revoked." *Id*.

Accordingly, following the passing of SB 270 during the 2008 Legislative Session, FI § 11-605 set forth:

(a) To qualify for a license, an applicant shall satisfy the Commissioner that:

\*       \*       \*

23

(2) The applicant is of good moral character and has general fitness to warrant the belief that the applicant will act as a mortgage originator in a lawful, honest, fair and efficient manner.

(b)(1) Except as provided in paragraph (2) of this subsection, the Commissioner may deny an application for a license filed by an individual who has committed an act that would serve as a sufficient ground for suspension or revocation of a license under this subtitle or a mortgage lender license under Subtitle 5 of this title.

(2) The Commissioner shall deny an application for a license filed by an individual who has been convicted within the last 10 years of a felony involving fraud, theft, or forgery.

2008 Md. Laws, ch. 7. The amended statutory language required "that the commissioner deny an application for a license filed by an individual who has been convicted within the last 10 years of a felony involving fraud, theft, or forgery[,]" which effectively strengthened the licensing requirements for mortgage loan originators. Dep't Legis. Servs., *Fiscal and Policy Note*, Senate Bill 270, at 4 (2008 Session).

The General Assembly last amended FI § 11-605 during the 2009 Legislative Session with the passing of Senate Bill 269 ("SB 269") to its current language "[for] the purpose of altering certain provisions of law regulating mortgage lenders and mortgage loan originators to conform to the requirements of the federal Secure and Fair Enforcement for Mortgage Licensing Act of 2008 [("SAFE Act").]" 2009 Md. Laws, ch. 4. The SAFE Act "establish[ed] a Nationwide Mortgage Licensing System and Registry for the residential mortgage industry" that provided "uniform license applications and reporting requirements for State-licensed loan originators." *See* Secure and Fair Enforcement for Mortgage Licensing Act of 2008, Pub. L. No. 110-289, § 1502, 122 Stat 2810. The SAFE Act advanced a federal mandate "requir[ing] all states to transition to the National

Mortgage Licensing System and Registry ("NMLS") and set[] minimum federal licensing standards." *See* Written Testimony from Carolyn Quattrocki, Governor's Legislative Office, Sarah B. Raskin, Commissioner of Financial Regulation, and Mark Kaufman, Deputy Commissioner of Financial Regulation to the Senate Finance Committee in legislative bill file for Senate Bill 269 (2009 Session).

"While Maryland [was] well ahead of many other states in mortgage licensing and regulation, Senate Bill 269 [made] the changes which [were] still necessary to bring the State into compliance with the SAFE Act and to facilitate the transition to NMLS." *Id*. Further, the Office of Counsel to the General Assembly also confirmed in a letter dated April 6, 2009, that SB 269 "conforms to all SAFE Act requirements." *See* Letter from Kathryn Rowe, Assistant Attorney General, and Christopher J. Young, Assistant Attorney General, to The Honorable Brian Feldman, House Economic Matters Committee in legislative bill file for Senate Bill 269 (2009).

The Floor Report for SB 269 establishes that this legislation altered the "licensing requirements . . . for mortgage lenders and mortgage loan originators" and required "licensees to submit certain information to the Nationwide Multistate Licensing System and Registry[.]" *See* Floor Report, Senate Bill 269, Senate Finance Committee of the Maryland Senate, 2009 Leg., 419th Sess. (Md. 2009). Specifically, SB 269 established that "the commissioner may not issue a mortgage loan originator's license unless the applicant . . . has never been convicted of, pled guilty, or pled *nolo contendere* to a felony involving an act of fraud, dishonesty, a breach of trust, or money laundering[.]" *Id*. The amended statutory language again strengthened the licensing requirements for applicants

25

seeking a mortgage loan originator's license.  Dep't Legs. Servs., *Fiscal and Policy Note*, Senate Bill 269, at 1 (2009 Session).  As amended, the statute permanently prohibits those individuals with felony convictions involving "an act of fraud, dishonesty, a breach of trust, or money laundering" from qualifying for a mortgage loan originator's license in accordance with the federal mandate established in the SAFE Act.  FI § 11-605(a)(2)(ii).

Members of the mortgage loan industry are given access to people's private financial information and therefore it is in the general public's interest that individuals employed as mortgage loan originators are of good moral character.  A review of the legislative history of FI § 11-605 clearly indicates that the General Assembly, in accordance with the SAFE Act's federal mandate, intended to combat the problems arising from the dishonesty and untrustworthiness amongst individuals employed in the mortgage loan industry in enacting and subsequently amending FI § 11-605.  Accordingly, this Court is bound by that federal mandate and the legislative policy set forth in FI § 11-605 in considering Ms. Smith's Petition.

*3.    The Circuit Court's Denial of Ms. Smith's Petition*

In its analysis, the circuit court acknowledged that Ms. Smith "met her burden of proving" the qualifications this Court set forth in *Skok*.  However, the circuit court ultimately denied Ms. Smith's Petition because the court found that the extraordinary remedy of a writ of error *coram nobis* is not necessary to effectuate justice in this case.  As previously discussed, satisfaction of the *Skok* qualifications does not automatically entitle a petitioner to a writ of error *coram nobis*.  Instead, this is just one piece of the circuit court's analysis in reviewing a petition for writ of error *coram nobis*.  It is within the circuit

26

court's discretion to determine whether the petition for writ of error *coram nobis* also presents circumstances compelling such action to achieve justice, as adopted by the *Skok* Court. The circuit court did not err by looking beyond Ms. Smith's satisfaction of the *Skok* qualifications to determine whether to grant the Petition.

Here, the circuit court looked to the legislative purpose of FI § 11-605 in determining that Ms. Smith's Petition did not present circumstances compelling this extraordinary remedy to effectuate justice. The circuit court concluded that the General Assembly intended to combat issues of dishonesty and untrustworthiness within the mortgage loan industry with the enactment of and subsequent amendments to FI § 11-605. The circuit court emphasized in its analysis that Ms. Smith "had access to personal and private information given to her by her employer when she committed the offenses that led her to plead guilty to one count of Forgery and two counts of Fraud (Identity Theft)." Accordingly, the circuit court determined that Ms. Smith fits squarely within the federally mandated prohibition established in FI § 11-605.

This Court reviews the circuit court's denial of Ms. Smith's Petition for an abuse of discretion. *Rich*, 454 Md. at 470–71. We would reverse the circuit court's denial of Ms. Smith's Petition only where the decision under consideration is well removed from any center mark imagined by this Court and beyond the fringe of what we deem minimally acceptable. *Aventis Pasteur, Inc. v. Skevofilax*, 396 Md. 405, 418–19 (2007). Reviewing the circuit court's analysis and conclusion, it is clear that the circuit court's decision is not well removed from any center mark. The legislative purpose of FI § 11-605 is a relevant consideration for the circuit court where granting Ms. Smith's Petition would effectively

27

circumvent the federally mandated prohibition against Ms. Smith receiving a mortgage loan originator's license set forth in FI § 11-605. Accordingly, we affirm the judgment of the Court of Special Appeals.

## CONCLUSION

For the foregoing reasons, we hold that the circuit court did not abuse its discretion in denying Ms. Smith's Petition. Satisfaction of the qualifications set forth by this Court in *Skok* is only one consideration in examining a petition for writ of error *coram nobis*. It is within the *coram nobis* court's discretion to also consider whether the petition for writ of error *coram nobis* presents the rare circumstances where this extraordinary remedy is necessary to achieve justice. Here, the circuit court appropriately exercised its discretion in considering the *Skok* qualifications, examining the legislative purpose of FI § 11-605 and the federal mandate that it encompasses, and ultimately denying Ms. Smith's Petition. Accordingly, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

28